# IN THE SUPREME COURT OF IOWA

No. 12–0243

Filed May 3, 2013

**HEATHER MARTIN GARTNER** and **MELISSA GARTNER,** Individually and as Next Friends of MACKENZIE JEAN GARTNER, a Minor Child**,**

    Appellees,

vs.

**IOWA DEPARTMENT OF PUBLIC HEALTH,**

    Appellant.

---

Appeal from the Iowa District Court for Polk County, Eliza J. Ovrom, Judge.

The State appeals from a district court order requiring the Iowa Department of Public Health to issue a birth certificate naming the nonbirthing spouse in a lesbian marriage as the parent of a child born to the couple while married. **AFFIRMED AS MODIFIED.**

Thomas J. Miller, Attorney General, Julie F. Pottorff, Deputy Attorney General, and Heather L. Adams, Assistant Attorney General, for appellant.

Camilla B. Taylor and Kenneth D. Upton, Jr., Chicago, Illinois, and Sharon K. Malheiro of Davis, Brown, Koehn, Shors & Roberts, P.C., Des Moines, for appellees.

Timm W. Reid, Des Moines, and Byron J. Babione, Scottsdale, Arizona, for amicus curiae Iowa Family Policy Center.

Lance W. Lange and Nicole N. Nayima of Faegre Baker Daniels LLP, Des Moines, and Michael A. Ponto of Faegre Baker Daniels LLP, Minneapolis, Minnesota, for amicus curiae National Association of Social Workers, Iowa Chapter.

Amanda C. Goad, New York, New York, and Randall C. Wilson of ACLU of Iowa Foundation, Inc., Des Moines, for amici curiae American Civil Liberties Union Foundation and American Civil Liberties Union of Iowa.

Catherine C. Dietz-Kilen and Earl B. Kavanaugh of Harrison & Dietz-Kilen, P.L.C., Des Moines, and Shannon P. Minter, Catherine P. Sakimura, and Angela K. Perone, San Francisco, California, for amici curiae professors of law.

**WIGGINS, Justice.**

In this appeal, we must decide whether Iowa Code section 144.13(2) (2011) requires the Iowa Department of Public Health to list as a parent on a child's birth certificate the nonbirthing spouse in a lesbian marriage when the child was born to one of the spouses during the couple's marriage. The district court interpreted the statute to require the Department to issue a birth certificate listing the spouse as the child's parent. The district court also stayed its ruling as to any other birth certificates the Department may issue to married lesbian couples pending the appeal of the district court's ruling.

On appeal, we conclude that we cannot interpret the statute in the same manner as the district court. However, we do find section 144.13(2) as applied to married lesbian couples violates the equal protection clauses found in article I, sections 1 and 6 of the Iowa Constitution. Accordingly, the Department must presumptively list on a child's birth certificate the nonbirthing spouse in a lesbian marriage when the child was born to one of the spouses during their marriage. Consequently, we affirm the judgment of the district court ordering the Department to issue a birth certificate naming both spouses as parents. Therefore, we remand the case to the district court, order the district court to lift the stay, and order the district court to remand the case to the Department for issuance of a birth certificate also listing the nonbirthing spouse as the child's parent.

## I. Background Facts and Proceedings.

**A. The Gartner Family.** Melissa and Heather Gartner are a lesbian couple. They have been in a loving, committed relationship since

December 2003. On March 18, 2006, they participated in a commitment ceremony with family and friends.

The couple dreamed of the day they would become parents. Acting on that desire, they began planning their family. The couple agreed Heather would serve as the biological mother, but both would act as equal parents to their children. Melissa decided to stay home to be the children's primary caregiver, while Heather worked outside the home.

Heather conceived their first child by anonymous donor insemination. Melissa participated in every step of Heather's pregnancy, which included choosing the anonymous sperm donor. Melissa was present for the birth of the couple's first child.

Because Melissa and Heather were not legally married at the time of the first child's birth, the couple went through formal adoption procedures to ensure Melissa's name was on the child's birth certificate. The Gartners successfully navigated the adoption process after both Melissa and Heather underwent background checks for criminal misconduct and sexual abuse. Heather characterized the adoption process as expensive, intrusive, and laborious. Once the couple finalized the adoption, the Department issued the child's birth certificate, which named both Heather and Melissa as parents.

Two years later, in April 2009, we decided *Varnum v. Brien*, 763 N.W.2d 862 (Iowa 2009), which held Iowa's Defense of Marriage Act unconstitutional. Thereafter, the state began solemnizing same-sex marriages. Melissa and Heather Gartner subsequently married in Des Moines on June 13. Heather was approximately six months pregnant with the couple's second child, Mackenzie Jean Gartner, at the time of their marriage.

Three months later, on September 19, Heather gave birth to Mackenzie. Heather conceived Mackenzie using the same anonymous donor as for their first child.

**B. The Birth Certificate.** The day after Mackenzie's birth, Heather and Melissa completed a form at the hospital to obtain Mackenzie's birth certificate. The Department provided the form. On the form, the Gartners indicated that both Heather and Melissa are Mackenzie's parents and that they are legally married.

The Department issued Mackenzie's birth certificate on approximately November 19. The certificate only listed Heather as Mackenzie's parent. The space for the second parent's name was blank.

**C. Proceedings.** After receiving Mackenzie's birth certificate naming only Heather, the Gartners sent a letter to the Department requesting a birth certificate recognizing both Heather and Melissa as Mackenzie's parents. The Department denied the request. The Department refused to place the name of the nonbirthing spouse in a lesbian marriage on the birth certificate without the spouse first adopting the child, pursuant to Iowa Code section 144.23(1). The Department indicated: "The system for registration of births in Iowa currently recognizes the biological and 'gendered' roles of 'mother' and 'father,' grounded in the biological fact that a child has one biological mother and one biological father . . . ."

The Gartners then filed a mandamus action in the district court. The Department moved to dismiss for lack of subject matter jurisdiction. After various motions, amendments, and refilings, the district court dismissed the Gartners' mandamus action without prejudice for lack of jurisdiction. The district court determined the Iowa Administrative

Procedure Act (IAPA) provided the Gartners with the exclusive means for obtaining review of the Department's decision.

Accordingly, the Gartners brought this subsequent action for judicial review under the IAPA. The district court ordered the Department to issue Mackenzie a birth certificate naming Melissa as a legal parent. The district court found under the presumption of parentage, the Department erred in not naming Melissa on Mackenzie's birth certificate. However, the district court did not reach the constitutional issues, focusing instead on the Department's interpretation of section 144.13(2).

The Department timely filed its notice of appeal and a motion to stay the district court's ruling. The district court denied the stay as to the Gartners, but granted it for other birth certificates the Department may issue while the appeal of the district court's ruling in this case is pending. Thus, the district court required the Department to issue the Gartners a birth certificate listing both spouses as parents, but did not require the Department to extend the same practice to other married lesbian couples.

## II. Issues.

We must decide if we can interpret Iowa Code section 144.13(2), otherwise known as Iowa's presumption of parentage statute, to require the Department to list as a parent on a child's birth certificate the nonbirthing lesbian spouse, when the other spouse conceived the child during the marriage using an anonymous sperm donor. If we cannot adopt such an interpretation of the statute, we then must determine whether the Department's refusal to list the nonbirthing lesbian spouse on the child's birth certificate violates the equal protection clauses in

article I, sections 1 and 6 of the Iowa Constitution or the due process clause in article I, section 9 of the Iowa Constitution.

### III. Standard of Review.

**A. Statutory Interpretation.** An individual adversely affected by administrative agency action is entitled to judicial review. Iowa Code § 17A.19(1). Iowa Code section 17A.19(10) of the IAPA governs judicial review of agency decisions. *NextEra Energy Res. LLC v. Iowa Utils. Bd.*, 815 N.W.2d 30, 36 (Iowa 2012). The Department is an agency governed by the IAPA. *See, e.g.*, *Birchansky Real Estate, L.C. v. Iowa Dep't of Pub. Health*, 737 N.W.2d 134, 138 (Iowa 2007) (applying the IAPA when analyzing the Department's interpretation of a statute); *Greenwood Manor v. Iowa Dep't of Pub. Health*, 641 N.W.2d 823, 828, 833–35 (Iowa 2002) (reviewing action by a division of the Department under the IAPA).

The agency action at issue here is the Department's interpretation of the presumption of parentage in Iowa Code section 144.13(2). Specifically, the Department interpreted section 144.13(2), containing the terms husband, father, and paternity, to apply only to a male spouse in an opposite-sex marriage, not a female spouse in a lesbian marriage.

The deference we give to the Department's decision depends upon the legislative grant of authority to the agency. If the legislature "clearly vested the agency with the authority to interpret the statute at issue," we reverse the Department's decision only when its interpretation is "irrational, illogical, or wholly unjustifiable." *NextEra*, 815 N.W.2d at 36–37 (citation and internal quotation marks omitted). However, if the legislature did *not* clearly vest the agency with such authority, we reverse the agency decision if it relies on an erroneous interpretation of the law. *Id.* at 37.

To determine the breadth of the agency's vested authority, we carefully consider " 'the specific language the agency has interpreted as well as the specific duties and authority given to the agency with respect to enforcing particular statutes.' " *Id.* (quoting *Renda v. Iowa Civil Rights Comm'n*, 784 N.W.2d 8, 13 (Iowa 2010)). We recognize that even though "[t]he legislature may explicitly vest the authority to interpret an entire statutory scheme with an agency[,] . . . the fact that an agency has been granted rule making authority does not 'give[] an agency the authority to interpret *all* statutory language.' " *Evercom Sys., Inc. v. Iowa Utils. Bd.*, 805 N.W.2d 758, 762 (Iowa 2011) (quoting *Renda*, 784 N.W.2d at 13). " '[B]road articulations of an agency's authority, or lack of authority, should be avoided in the absence of an express grant of broad interpretive authority.' " *NextEra*, 815 N.W.2d at 37 (quoting *Renda*, 784 N.W.2d at 14). The agency's own belief that the legislature vested it with interpretive authority is irrelevant. Iowa Code § 17A.19(11)(*a*).

There are specific standards to assist us in determining the scope of the agency's interpretive authority. These standards are found in Iowa Code section 17A.19(10), subsections (*a*) through (*n*). We use these standards to see if we reach the same result as the district court regarding whether the agency has clearly vested authority to interpret the statute. *Renda*, 784 N.W.2d at 10.

The validity of agency action under these standards turns on the type of action taken. There are at least three types of agency action: (1) contested case hearings, (2) rulemaking, and (3) the catchall category of other agency action. *Jew v. Univ. of Iowa*, 398 N.W.2d 861, 864 (Iowa 1987). Here, the parties do not dispute that this action falls within the other agency action category.

After examining the Code, we find the legislature did not clearly vest the Department with the authority to interpret section 144.13(2). To reach this conclusion, we first recognize, in accordance with the district court's decision, that the legislature did not expressly authorize the Department to interpret section 144.13(2). A review of the language the Department has interpreted and its legislative grant of authority leads us to this result.

The Department's primary responsibility is to record vital events occurring within the state. *See* Iowa Code §§ 144.2, .5. The Department describes its role as custodian of vital statistics. The Code grants the Department the power to "adopt, amend, and repeal rules for the purpose of carrying out the provisions of [the Vital Statistics Code], in accordance with chapter 17A." *Id.* § 144.3. Nonetheless, rulemaking power does not give the Department the authority to interpret all statutory language. *NextEra*, 815 N.W.2d at 37. Accordingly, to find the Department had the authority to interpret the statutory terms at issue, including paternity, father, and husband, would be overreaching because these terms are not exclusively within the expertise of the Department. Instead, the legislature utilized these terms throughout the Iowa Code. For instance, the term "paternity" appears in statutes that the Department has no role in enforcing. *See, e.g.,* Iowa Code § 252A.3 (defining liability for the support of dependents); *id.* ch. 600B (detailing how to establish paternity and calculate child support).

Finally, the Department contends the appropriate standard of review is for correction of errors at law. By so arguing, the Department concedes the legislature did not instill in the agency the authority to interpret the presumption of parentage statute. Thus, we agree with the district court and accord no deference to the Department's interpretation

of the statute when deciding whether the Department breached the abovementioned standards. *Id.* § 17A.19(11)(*b*) ("[T]he [reviewing] court . . . [s]hould not give any deference to the view of the agency with respect to particular matters that have not been vested by a provision of law in the discretion of the agency."). Accordingly, our task is to determine whether the Department erroneously interpreted the presumption of parentage.

**B. Constitutional Issues.** We can grant relief from administrative proceedings if the agency's action is "[u]nconstitutional on its face or as applied or is based upon a provision of law that is unconstitutional on its face or as applied." *Id.* § 17A.19(10)(*a*). The court gives the agency no deference regarding the constitutionality of the statute or administrative rule. *NextEra*, 815 N.W.2d at 44. Determining whether a statute or administrative rule offends the state or federal constitution is a task "entirely within the province of the judiciary . . . ." *Id.* Thus, we review agency action involving constitutional issues de novo. *Id.*

### IV. Iowa's Presumption of Parentage Statute.

Iowa's Vital Statistics Code requires filing a certificate of birth with the Department within seven days of a live birth occurring in the state. Iowa Code § 144.13(1)(*a*). The state uses the birth certificate to establish the fact a birth occurred, as well as to identify the child for immunization purposes. *Id.* § 144.13(1)(*a*), (*d*).

For purposes of preparing a birth certificate, the Code includes a presumption of parentage. *See id.* § 144.13(2). The legislature articulated the following procedure for preparing a child's birth certificate, based upon the presumption of parentage:

> If the mother was married at the time of conception, birth, or at any time during the period between

conception and birth, the name of the husband shall be entered on the certificate as the father of the child unless paternity has been determined otherwise by a court of competent jurisdiction, in which case the name of the father as determined by the court shall be entered by the department.

*Id.* The statute is rebuttable under the preponderance standard "by clear, strong and satisfactory evidence." *In re Marriage of Schneckloth*, 320 N.W.2d 535, 536 (Iowa 1982). The challenging party must also demonstrate a parental relationship with the child. *Huisman v. Miedema*, 644 N.W.2d 321, 325 (Iowa 2002). Here, rebutting the presumption is a nonissue, because Heather conceived Mackenzie using an anonymous sperm donor.

The presumption of parentage is a fundamental legal construct originating in common law. *Michael H. v. Gerald D.*, 491 U.S. 110, 124, 109 S. Ct. 2333, 2343, 105 L. Ed. 2d 91, 107 (1989). A New York court described the presumption's development as follows:

At common law, parentage derived from two events, a child's birth to its "mother," and the mother's marriage to a man. Children born out-of-wedlock had only one legal parent, their birth mother. Recognizing the many advantages that flowed to children from having two parents, legislatures enacted filiation or paternity proceedings to confer legal parentage on non-marital biological/genetic fathers, a status which carries support and other obligations. Similarly, adoption statutes established legal parentage for married couples who were biological/genetic strangers to a child.

*In re Adoption of Sebastian*, 879 N.Y.S.2d 677, 679 (Sur. Ct. 2009) (footnote and internal citations omitted).

Legislatures across the nation have adopted statutes codifying a presumption of parentage in order to address several key social policies.[1]

---

[1]Numerous states have codified their presumption of parentage. Certain characteristics allow us to classify these provisions into three separate categories.

First, there are statutes using traditional, gendered terms (such as husband, wife, man, woman, father, and mother), without referencing the parent as natural or biological. *See* Ala. Code § 26-17-204(a)(1) (LexisNexis 2012) ("A man is presumed to be the father of a child if . . . he and the mother of the child are married to each other and the child is born during the marriage . . . ."); Alaska Stat. § 18.50.160(d) (2012) ("If the mother was married at conception, during the pregnancy, or at birth, the name of the husband shall be entered on the certificate as the father of the child . . . ."); Ariz. Rev. Stat. Ann. § 25-814(A)(1) (2012) ("A man is presumed to be the father of the child if . . . [h]e and the mother of the child were married at any time in the ten months immediately preceding the birth . . . ."); Cal. Fam. Code § 7540 (West 2013) ("[T]he child of a wife cohabiting with her husband, who is not impotent or sterile, is conclusively presumed to be a child of the marriage."); Del. Code Ann. tit. 13, § 8–204(*a*)(1) (West 2012) ("A man is presumed to be the father of a child if . . . [h]e and the mother of the child are married to each other and the child is born during the marriage . . . ."); Fla. Stat. Ann. § 382.013(2)(*a*) (West 2013) ("If the mother is married at the time of birth, the name of the husband shall be entered on the birth certificate as the father of the child, unless paternity has been determined otherwise by a court of competent jurisdiction."); Kan. Stat. Ann. § 23-2208(*a*)(1) (West 2012) ("A man is presumed to be the father of a child if . . . [t]he man and the child's mother are, or have been, married to each other and the child is born during the marriage . . . ."); Ky. Rev. Stat. Ann. § 406.011 (West 2012) ("A child born during lawful wedlock, or within ten (10) months thereafter, is presumed to be the child of the husband and wife."); La. Civ. Code Ann. art. 185 (2012) ("The husband of the mother is presumed to be the father of a child born during the marriage or within three hundred days from the date of the termination of the marriage.); Md. Code Ann., Fam. Law § 5-1027(*c*)(1) (LexisNexis 2012) ("There is a rebuttable presumption that the child is the legitimate child of the man to whom its mother was married at the time of conception."); Mass. Gen. Laws Ann. ch. 209C, § 6(*a*)(1) (West 2013) ("[A] man is presumed to be the father of a child . . . if . . . he is or has been married to the mother and the child was born during the marriage, or within three hundred days after the marriage was terminated by death, annulment or divorce . . . ."); N.M. Stat. Ann. § 40-11A–204(A)(1) (2012) ("A man is presumed to be the father of a child if . . . he and the mother of the child are married to each other and the child is born during the marriage . . . ."); N.C. Gen. Stat. § 49-12.1 (2011) (allowing a putative father to overcome the "presumption of legitimacy" that the father is the man to whom the child's mother is married); N.D. Cent. Code Ann. § 14-20-10(1)(a) (West 2011) ("A man is presumed to be the father of a child if . . . [h]e and the mother of the child are married to each other and the child is born during the marriage."); Okla. Stat. Ann. tit. 10, § 7700-204(A)(1) (West 2013) ("A man is presumed to be the father of a child if . . . [h]e and the mother of the child are married to each other and the child is born during the marriage . . . ."); Or. Rev. Stat. Ann. § 109.070(1)(*a*) (West 2012) ("A man is rebuttably presumed to be the father of a child born to a woman if he and the woman were married to each other at the time of the child's birth . . . ."); R.I. Gen. Laws Ann. § 23-3-10(*d*)(1) (West 2012) ("If the mother was married either at the time of conception or birth, the name of the husband shall be entered on the certificate as the father of the child . . . ."); S.D. Codified Laws § 25-8-57 (2012) ("Any child born in wedlock, or born within ten months after dissolution of the marriage, is presumed legitimate to that marriage . . . ."); Tenn. Code Ann. § 36-2-304(*a*)(1) (2012) ("A man is rebuttably presumed to be the father of a child if . . . [t]he man and the child's mother are married or have been married to each other and the child is born during the marriage . . . .");

Tex. Fam. Code Ann. § 160.204(*a*)(1) (West 2012) ("A man is presumed to be the father of a child if . . . he is married to the mother of the child and the child is born during the marriage . . . ."); Wyo. Stat. Ann. § 14-2-504(*a*)(i) (2011) ("A man is presumed to be the father of a child if . . . [h]e and the mother of the child are married to each other and the child is born during the marriage . . . .").

Second, there are code provisions applying the presumption only when the presumed parent shares a genetic connection with the child. These statutes refer to those eligible to be the presumed parent as the "natural" or "biological" parent. *See* Colo. Rev. Stat. § 19-4-105(1)(a) (2012) ("A man is presumed to be the natural father of a child if . . . [h]e and the child's natural mother are or have been married to each other and the child is born during the marriage . . . ."); Haw. Rev. Stat. § 584-4(*a*)(1) (2007) ("A man is presumed to be the natural father of a child if . . . [h]e and the child's natural mother are or have been married to each other and the child is born during the marriage . . . ."); 750 Ill. Comp. Stat. Ann. 45/5(*a*)(1) (West 2012) ("A man is presumed to be the natural father of a child if . . . he and the child's natural mother are or have been married to each other . . . and the child is born or conceived during such marriage . . . ."); Ind. Code Ann. § 31-14-7-1(1)(A) (LexisNexis 2012) ("A man is presumed to be a child's biological father if . . . the . . . man and the child's biological mother are or have been married to each other . . . ."); Mich. Comp. Laws Ann. § 700.2114(1)(*a*) (West 2012) ("If a child is born or conceived during a marriage, both spouses are presumed to be the natural parents of the child for purposes of intestate succession. A child conceived by a married woman with the consent of her husband following utilization of assisted reproductive technology is considered as their child for purposes of intestate succession. Consent of the husband is presumed unless the contrary is shown by clear and convincing evidence. If a man and a woman participated in a marriage ceremony in apparent compliance with the law before the birth of a child, even though the attempted marriage may be void, the child is presumed to be their child for purposes of intestate succession."); Minn. Stat. Ann. § 257.55(1)(*a*) (West 2013) ("A man is presumed to be the biological father of a child if . . . he and the child's biological mother are or have been married to each other and the child is born during the marriage . . . ."); Mo. Ann. Stat. § 210.822.1(1) (West 2013) ("A man shall be presumed to be the natural father of a child if . . . [h]e and the child's natural mother are or have been married to each other and the child is born during the marriage . . . ."); Mont. Code Ann. § 40–6–105(1)(*a*) (2011) ("A person is presumed to be the natural father of a child if . . . the person and the child's natural mother are or have been married to each other and the child is born during the marriage . . . ."); Nev. Rev. Stat. § 126.051(1)(*a*) (2011) ("A man is presumed to be the natural father of a child if . . . [h]e and the child's natural mother are or have been married to each other and the child is born during the marriage . . . ."); N.J. Stat. Ann. § 9:17–43(*a*)(1) (West 2012) ("A man is presumed to be the biological father of a child if . . . [h]e and the child's biological mother are or have been married to each other and the child is born during the marriage . . . ."); Ohio Rev. Code Ann. § 3111.03(A)(1) (LexisNexis 2012) ("A man is presumed to be the natural father of a child [if] . . . [t]he man and the child's mother are or have been married to each other, and the child is born during the marriage . . . ."); Vt. Stat. Ann. tit. 15, § 308(4) (2012) ("A person alleged to be a parent shall be rebuttably presumed to be the natural parent of a child if . . . the child is born while the husband and wife are legally married to each other."); Wis. Stat. Ann. § 891.41(1)(*a*) (West 2012) ("A man is presumed to be the natural father of a child if . . . [h]e and the child's natural mother are or have been married to each

Specifically, "the presumption protected the legitimacy of children, which in turn entitled them to the financial support, inheritance rights, and filiation obligations of their parents."  Diane S. Kaplan, *Why Truth Is Not a Defense in Paternity Actions*, 10 Tex. J. Women & L. 69, 70 (2000) [hereinafter Kaplan].  It thwarted the possibility that children would become wards of the state and promoted familial stability by preventing "a third-party putative father from insinuating himself onto an intact family by claiming to have sired one of the family's children."  *Id.* at 70–71; *see also Michael H.*, 491 U.S. at 125, 109 S. Ct. at 2343, 105 L. Ed. 2d at 107.  Moreover, at a time when "genetic origins were more a matter of suspicion than science," the presumption served judicial efficiency by curtailing debates between parents as to the biological nature of their parent–child relationship.  Kaplan, 10 Tex. J. Women & L. at 71.

---

other and the child is conceived or born after marriage and before the granting of a decree of legal separation, annulment or divorce between the parties.").

Finally, there are statutes that apply or could apply in a gender-neutral manner or to same-sex spouses.  *See* Ark. Code Ann. § 28-9-209(*a*)(2) (2011) ("A child born or conceived during a marriage is presumed to be the legitimate child of both spouses . . . ."); D.C. Code § 16–909(*a*–1)(1) (2012) ("There shall be a presumption that a woman is the mother of a child if she and the child's mother are or have been married, or in a domestic partnership, at the time of either conception or birth, or between conception or birth, and the child is born during the marriage or domestic partnership . . . ."); Ga. Code Ann. § 19-7-20(*a*) (West 2012) ("All children born in wedlock or within the usual period of gestation thereafter are legitimate."); Neb. Rev. Stat. § 42-377 (2012) ("Children born to the parties, or to the wife, in a marriage relationship . . . shall be legitimate . . . ."); N.Y. Dom. Rel. Law § 24(1) (McKinney 2013) ("A child heretofore or hereafter born of parents who prior or subsequent to the birth of such child shall have entered into a civil or religious marriage, or shall have consummated a common-law marriage where such marriage is recognized as valid, in the manner authorized by the law of the place where such marriage takes place, is the legitimate child of both birth parents notwithstanding that such marriage is void or voidable or has been or shall hereafter be annulled or judicially declared void."); Wash. Rev. Code Ann. § 26.26.116(1)(*a*) (West 2013) ("In the context of a marriage or a domestic partnership, a person is presumed to be the parent of a child if . . . [t]he person and the mother or father of the child are married to each other or in a domestic partnership with each other and the child is born during the marriage or domestic partnership . . . .").

Based on these social policies, "ten states and the District of Columbia have extended (or are set to extend) the 'marital' parentage presumption to same-sex couples in the formalized relationship of marriage, civil union, or domestic partnership." Nancy D. Polikoff, *A Mother Should Not Have to Adopt Her Own Child: Parentage Laws for Children of Lesbian Couples in the Twenty-First Century*, 5 Stan. J. C.R. & C.L., 201, 247 (2009).

Specific to Iowa, our court long ago articulated the principal bases for presuming a child born in wedlock is the legitimate issue of the marital spouses:

> "This rule is founded on decency, morality, and public policy. By that rule, the child is protected in his inheritance and safeguarded against future humiliation and shame. Likewise, under the rule, the family relationship is kept sacred and the peace and harmony thereof preserved. No one, by incompetent evidence, can malign the virtue of the mother, and no one, by such evidence, can interrupt the harmony of the family relationship and undermine the sanctity of the home."

*Heath v. Heath*, 222 Iowa 660, 661, 269 N.W. 761, 761 (Iowa 1936) (quoting *Craven v. Selway*, 216 Iowa 505, 508, 246 N.W. 821, 823 (Iowa 1933), *overruled on other grounds by In re Marriage of Schneckloth*, 320 N.W.2d at 537)). Taking these policies individually, we recognize the strong stigma accompanying illegitimacy.[2] The presumption counteracts the stigma by protecting the integrity of the marital family, even when a biological connection is not present. The presumption in Iowa even protects the child if the parents' marriage later terminates. Iowa Code

---

[2]The Iowa Code chapter dealing with paternity and the obligation for support prohibits reference to illegitimacy, except in birth records and certificates or in judicial records where paternity is in dispute. *See* Iowa Code § 600B.35. The statute specifically states, "[T]he term *biological* shall be deemed *equivalent* to the term *illegitimate* when referring to *parentage* or birth out of wedlock." *Id.* (emphasis added).

§ 598.31. Specifically, the legitimacy statute located in the dissolution chapter of the Iowa Code indicates:

> Children born to the *parties*, or to the *wife*, in a marriage relationship which may be terminated or annulled pursuant to the provisions of this chapter shall be legitimate as to both *parties*, unless the court shall decree otherwise according to the proof.

*Id.* (emphasis added).

Finally, the presumption in Iowa functions to ensure a child's right to financial support against a spouse's claim of not being a biological parent. *See* Iowa Code § 252A.3(4). The child support statute provides:

> A child or children born of *parents* who, at any time prior or subsequent to the birth of such child, have entered into a civil or religious marriage ceremony, shall be deemed the legitimate child or children of both *parents*, regardless of the validity of such marriage.

*Id.* (emphasis added).

In Iowa, the presumption applies broadly, legitimizing children born during marriages formally solemnized, as well as those satisfying the requirements for common law marriage, pursuant to Iowa Code section 595.18. *See Estate of Hawk v. Lain*, 329 N.W.2d 660, 663 (Iowa 1983).

## V. Statutory Interpretation of Iowa Code Section 144.13(2).

The district court interpreted section 144.13(2) to require the Department to list Melissa as Mackenzie's second parent on the birth certificate. We do not agree the statute can be interpreted in this way.

When construing a statute, we have stated:

> The goal of statutory construction is to determine legislative intent. We determine legislative intent from the words chosen by the legislature, not what it should or might have said. Absent a statutory definition or an established meaning in the law, words in the statute are given their ordinary and common meaning by considering the context

within which they are used. Under the guise of construction, an interpreting body may not extend, enlarge or otherwise change the meaning of a statute.

*Auen v. Alcoholic Beverages Div.*, 679 N.W.2d 586, 590 (Iowa 2004) (internal citations omitted).

A specific rule of construction found in Iowa Code section 4.1 applies to statutes containing gendered terms and assists us in ascertaining the legislature's intent. Section 4.1 provides: "Words of one gender include the other genders." Iowa Code § 4.1(17). This is not, however, a blanket rule applicable to all types of statutes. Instead, courts construing statutes can only utilize this rule when the statute uses a specific type of gendered language.

When the statute refers to only *one* gender and the gender referenced is *masculine,* section 4.1(17) extends the statute to include females. The Henry County District Court observed this legal truth in an early decision concerning whether it should admit Arabella Mansfield to the Iowa bar. At that time, the Iowa statute regulating the bar admission of attorneys referred to only "white male person[s]." Iowa Code § 2700 (1860). The court relied on a prior version of section 4.1(17)[3] and found "not only by the language of the law itself, but by the demands and necessities of the present time and occasion," that masculine terms include feminine words. Mary L. Clark, *The Founding of the Washington College of Law: The First Law School Established by Women for Women*, 47 Am. U. L. Rev. 613, 622 n.45 (1998). As a result, Mansfield became the first woman to secure a state law license in the United States. Richard, Lord Acton & Patricia Nassif Acton, *To Go Free: A Treasury of Iowa's Legal Heritage*, 132 (Iowa State Univ. Press 1995). Since then, we

---

[3]Iowa Code § 29.3 (1860).

have applied the rule in various other contexts.[4] Thus, when a statute employs a masculine term, we will construe the scope of the statute to include the corresponding feminine term.

However, when the statute refers to only *one* gender and the gender referenced is *feminine,* section 4.1(17) does not extend the scope of the statute to include males. *Young v. O'Keefe,* 246 Iowa 1182, 1188, 69 N.W.2d 534, 537 (1955). There, the court found that a husband could not recover under a pension statute, because the court could not enlarge the term "widow," as it referred to the surviving spouse who was eligible for survivor benefits, to include "widowers." *Id.* at 1186–89, 69 N.W.2d at 537–38 ("Nowhere . . . do we find any statute or authority permitting substitution of the *masculine* for the *feminine.*").

Finally, when the statute employs *both* masculine and feminine words, section 4.1(17) does not apply. *Cf. State ex rel. Mitchell v. McChesney,* 190 Iowa 731, 733–34, 180 N.W. 857, 858 (1921). Reading such a statute in a gender-neutral manner "would destroy or change" the plain and unambiguous language, and would "nullif[y] the intent of the Legislature." *Id.* at 734, 180 N.W. at 858.

Iowa's presumption of parentage statute expressly uses *both* masculine and feminine words by referring to a mother, father, and husband. *See* Iowa Code § 144.13(2). Accordingly, section 4.1(17) does not apply. If we applied the rule and imposed a gender-neutral

---

[4]*See, e.g., State v. Clark,* 180 Iowa 477, 483, 163 N.W. 250, 253 (1917) (finding a jury instruction on the credibility of witnesses, which referred to "him," did not single the defendant out from the minor female, an alleged rape victim, because the masculine term also included females); *Haerther v. Mohr,* 114 Iowa 636, 636–37, 87 N.W. 692, 692 (1901) (recognizing a life insurance policy designating the deceased husband's beneficiaries as "*his* executors, administrators, or assigns" also included those of his wife (emphasis added)).

interpretation of the presumption, we would destroy the legislature's intent to *unambiguously* differentiate between the roles assigned to the two sexes. Only a male can be a husband or father. Only a female can be a wife or mother. The legislature used plain and unambiguous language to convey its intent. Thus, we cannot nullify the intent of the legislature by finding otherwise through statutory construction.

Finally, the district court relied on our decision in *Varnum* to compel its statutory construction analysis. At the time of enactment, the legislature made a conscious choice to use the word "husband." It could have chosen to use spouse or other such language, but it did not.[5] *Varnum* was decided thirty-nine years after the legislature enacted section 144.13(2). *See* 1970 Iowa Acts ch. 1081, § 14. Hence, it is doubtful the legislature considered same-sex marriages when it enacted section 144.13(2). Husband was an unambiguous term at the time of passing section 144.13(2). Therefore, we cannot use the rules of statutory construction to extend, enlarge, or otherwise change the plain meaning of section 144.13(2).

Accordingly, we proceed to the second step of our analysis and determine whether the constitutional guarantees of equal protection and due process require applying the presumption of parentage to lesbian married couples.

**VI. Constitutional Analysis.**

At the district court and on appeal, the Gartners raised numerous constitutional arguments as to why section 144.13(2) is unconstitutional, facially and as applied. Although the district court did not decide the case on constitutional grounds, we can consider these grounds on appeal

[5]Footnote one cites the variations of this statute in our sister states.

to affirm the trial court's judgment, because the Gartners made the constitutional challenges below. *See Fencl v. City of Harpers Ferry*, 620 N.W.2d 808, 811–12 (Iowa 2000) ("[W]e may still affirm if there is an alternative ground, raised in the district court and urged on appeal, that can support the court's decision."); *Chauffeurs, Teamsters & Helpers, Local Union No. 238 v. Iowa Civil Rights Comm'n*, 394 N.W.2d 375, 378 (Iowa 1986) (indicating we may decide issues on appeal not reached by the district court when they have been raised in the district court and "fully briefed and argued" by the parties on appeal).

Although the parties have argued and briefed numerous constitutional issues in both courts, we can dispose of this appeal under the equal protection clauses of our Iowa Constitution. Thus, we need not address the due process claim.

The first clause in article I, section 1 states: "All men and women are, by nature, free and equal . . . ." Iowa Const. art. I, § 1. In an early case, we determined that this section of the Iowa Constitution guaranteed an African-American woman equal accommodations. *Coger v. Nw. Union Packet Co.*, 37 Iowa 145, 155–56 (1873). In *Coger*, we said:

> These rights and privileges rest upon the equality of all before the law, the very foundation principle of our government. If the negro must submit to different treatment, to accommodations inferior to those given to the white man, when transported by public carriers, he is deprived of the benefits of this very principle of equality. His contract with a carrier would not secure him the same privileges and the same rights that a like contract, made with the same party by his white fellow citizen, would bestow upon the latter.

*Id.* at 153–54.

We have also used article I, section 6 to determine if a statute violates equal protection guarantees under the state constitution. *See, e.g., Varnum,* 763 N.W.2d at 878, 907 (holding Iowa's Defense of

Marriage Act violates the equal protection clause of article I, section 6 of the Iowa Constitution); *Bierkamp v. Rogers*, 293 N.W.2d 577, 585 (Iowa 1980) (holding the guest statue violates the equal protection clause of article I, section 6 of the Iowa Constitution). Article I, section 6 provides: "All laws of a general nature shall have a uniform operation; the general assembly shall not grant to any citizen, or class of citizens, privileges or immunities, which, upon the same terms shall not equally belong to all citizens." Iowa Const. art. I, § 6.

We recently applied an equal protection analysis in *Varnum.* 763 N.W.2d at 878–906. There, we said that when conducting an equal protection analysis under the Iowa Constitution, the first step is to determine if the "laws treat all those who are similarly situated *with respect to the purposes of the law* alike." *Id.* at 883. Thus, our threshold inquiry is whether the Gartners are similarly situated to married opposite-sex couples for the purposes of applying the presumption of parentage. If they are, we proceed to the second step and decide which level of constitutional scrutiny to apply when conducting our review of the challenged statute. *Id.* at 879–80.

**A. Similarly Situated Analysis.** Under the Iowa Constitution, "the equal protection guarantee requires that laws treat all those who are similarly situated *with respect to the purposes of the law* alike." *Id.* at 883. Here, the Department is responsible for "install[ing], maintain[ing], and operat[ing] the system of vital statistics throughout the state." Iowa Code § 144.2. Vital statistics are the "records of births, deaths, fetal deaths, adoptions, marriages, dissolutions, annulments, and data related thereto." *Id.* § 144.1(15). The state uses birth certificates to establish the fact a birth occurred, as well as to identify a child for immunization purposes. *Id.* § 144.13(1)(*a*), (*d*). The state also uses a birth certificate to

verify a person's identity and date of birth. *See, e.g.,* Iowa Admin. Code r. 761—601.5(1)(*b*) (2009) (identifying a birth certificate as one of the documents persons applying for a new driver's license or nonoperator's identification card may provide to verify their identity and birthdate). The federal government recognizes the following purposes for birth certificates: (1) to maintain population statistics, (2) to confirm a child's identity, and (3) to ensure access to federal benefits and programs. *See* Dean Spade, *Documenting Gender,* 59 Hastings L.J. 731, 764–67 (2008) (discussing the federal government's use of birth certificates).

Thus, with respect to the subject and purposes of Iowa's marriage laws, we find the Gartners similarly situated to married opposite-sex couples. The Gartners are in a legally recognized marriage, just like opposite-sex couples. The official recognition of their child as part of their family provides a basis for identifying and verifying the birth of their child, just as it does for opposite-sex couples. Additionally, married lesbian couples require accurate records of their child's birth, as do their opposite-sex counterparts. The distinction for this purpose between married opposite-sex couples and married lesbian couples does not exist and cannot defeat an equal protection analysis. Therefore, with respect to the government's purpose of identifying a child as part of their family and providing a basis for verifying the birth of a child, married lesbian couples are similarly situated to spouses and parents in an opposite-sex marriage.

**B. Classification Analysis.** The Gartners argue the refusal of the Department to list both of the spouses in a lesbian marriage on the birth certificate of a child born during marriage classifies a person based on sex and sexual orientation under the Iowa Constitution. The Department contends the refusal only classifies individuals based on sex.

Nonetheless, the Department concedes that even if we classify the refusal on sex, an intermediate level of scrutiny applies.

In *Varnum*, we rejected the argument that the Defense of Marriage Act classified individuals based on sex and analyzed the classification based on sexual orientation. 763 N.W.2d at 885. The legislature's purposeful use of "husband" in section 144.13(2) does not allow married lesbian couples to have the nonbirthing spouse's name on the birth certificate when one of the spouses in that relationship gives birth to the child. Therefore, as in *Varnum*, the refusal to list the nonbirthing lesbian spouse on the child's birth certificate "differentiates implicitly on the basis of sexual orientation." *Id.*

**C. Application of Judicial Scrutiny.** Under *Varnum*, a sexual-orientation-based classification is subject to a heightened level of scrutiny under the Iowa Constitution. *Id.* at 896. Neither the Gartners nor the Department asks us to overturn *Varnum*, which requires the state to allow same-sex couples to marry. Therefore, it would be inappropriate for this court to revisit the *Varnum* decision. Instead, our task is to measure the Department's classification against the heightened-level-of-scrutiny standard.

Heightened scrutiny requires the State to show the statutory classification is substantially related to an important governmental objective. *Id.* Accordingly, we must evaluate whether the governmental objectives proffered by the State are important and whether the statutory classification substantially relates to those objectives. *Id.* at 897.

Our construction of the statute is the same as the Department's. The plain language of the statute requires the Department to put a husband's name on the birth certificate if a married opposite-sex couple has a child born during the marriage and if the couple used an

anonymous sperm donor to conceive the child. Thus, the statute treats married lesbian couples who conceive through artificial insemination using an anonymous sperm donor differently than married opposite-sex couples who conceive a child in the same manner. We must analyze this differential treatment to determine if it is substantially related to an important governmental objective.

In the Department's response to the Gartners' request for admissions, the State admitted Iowa Code section 144.13(2) requires the Department to put a male's name on a child's birth certificate if a married opposite-sex couple has a child born during the marriage and if the couple utilized an anonymous sperm donor to conceive the child. However, this is not true if paternity has been determined otherwise by a court of competent jurisdiction.

The Department enumerates three objectives supporting section 144.13(2)'s differing treatment of married, lesbian and opposite-sex couples. Specifically, the Department argues the government has an interest in the accuracy of birth certificates, the efficiency and effectiveness of government administration, and the determination of paternity.

First, we understand that ensuring the accuracy of birth records for identification of biological parents is a laudable goal. However, the present system does not always accurately identify the biological father. When a married opposite-sex couple conceives a child using an anonymous sperm donor, the child's birth certificate reflects the male spouse as the father, not the biological father who donated the sperm. In that situation, the Department is not aware the couple conceived the child by an anonymous sperm donor.

Furthermore, the Department claims that the only way a married lesbian couple, who uses an anonymous sperm donor to conceive the child, can list the nonbirthing spouse as the parent on the birth certificate is to go through an adoption proceeding. This will not make the birth certificate any more accurate than applying the presumption of parentage for married lesbian couples, because the birth certificate still will not identify the biological father. The birth records of this state do not contain a statistical database listing the children conceived using anonymous sperm donors. Thus, the classification is not substantially related to the asserted governmental purpose of accuracy.

The Department next asserts the refusal to apply the presumption of parentage to nonbirthing spouses in lesbian marriages serves administrative efficiency and effectiveness. The Department argues that it takes valuable resources to reissue a birth certificate when a challenger successfully rebuts the presumption of parentage. However, when couples use an anonymous sperm donor, there will be no rebuttal of paternity. Moreover, even when couples conceive without using an anonymous sperm donor, there is no showing in the record that the presumption of paternity in opposite-sex marriages is rebutted in a significant number of births.

The Department concedes its interest in administrative efficiency and effectiveness is present when the Department puts the father on the birth certificate of a child born during the marriage of an opposite-sex couple. This efficiency is lost if the law is not applied equally to married lesbian couples. It is *more* efficient for the Department to list, presumptively, the nonbirthing spouse as the parent on the birth certificate when the child is born, rather than to require the Department to issue a birth certificate with only one spouse's name on the certificate

and then later, after an adoption is complete, reissue the certificate. These realities demonstrate that the disparate treatment of married lesbian couples is less effective and efficient, and that some other unarticulated reason, such as stereotype or prejudice, may explain the real objective of the State.

The third proffered reason for the Department's action is the government's interest in establishing paternity to ensure financial support of the child and the fundamental legal rights of the father. When a lesbian couple is married, it is just as important to establish who is financially responsible for the child and the legal rights of the nonbirthing spouse. As we said in *Varnum*:

> [Same-sex couples] are in committed and loving relationships, many raising families, just like heterosexual couples. Moreover, official recognition of their status provides an institutional basis for defining their fundamental relational rights and responsibilities, just as it does for heterosexual couples. Society benefits, for example, from providing same-sex couples a stable framework within which to raise their children and the power to make health care and end-of-life decisions for loved ones, just as it does when that framework is provided for opposite-sex couples.

*Id.* at 883. It is important for our laws to recognize that married lesbian couples who have children enjoy the same benefits and burdens as married opposite-sex couples who have children. By naming the nonbirthing spouse on the birth certificate of a married lesbian couple's child, the child is ensured support from that parent and the parent establishes fundamental legal rights at the moment of birth. Therefore, the only explanation for not listing the nonbirthing lesbian spouse on the birth certificate is stereotype or prejudice. The exclusion of the nonbirthing spouse on the birth certificate of a child born to a married

lesbian couple is not substantially related to the objective of establishing parentage.

Thus, section 144.13(2) fails to comport with the guarantees of equal protection under article I, sections 1 and 6 of the Iowa Constitution. The Department has been unable to identify a constitutionally adequate justification for refusing to list on a child's birth certificate the nonbirthing spouse in a lesbian marriage, when the child was conceived using an anonymous sperm donor and was born to the other spouse during the marriage. Thus, the language in section 144.13(2) limiting the requirement to "the name of the husband" on the birth certificate is unconstitutional as applied to married lesbian couples who have a child born to them during marriage.

## VII. Remedy.

We find the presumption of parentage statute violates equal protection under the Iowa Constitution as applied to married lesbian couples. However, we are not required to strike down the statute because our obligation is to preserve as much of a statute as possible, within constitutional restraints. *See Racing Ass'n of Cent. Iowa v. Fitzgerald*, 648 N.W.2d 555, 563 (Iowa 2002), *rev'd on other grounds*, 539 U.S. 103, 123 S. Ct. 2156, 156 L. Ed. 2d 97 (2003). Accordingly, instead of striking section 144.13(2) from the Code, we will preserve it as to married opposite-sex couples and require the Department to apply the statute to married lesbian couples. Therefore, we affirm the district court and order the Department to issue a birth certificate naming Melissa Gartner as the parent of the child, Mackenzie Jean Gartner.

## VIII. District Court's Stay Order.

The Department asked the district court to stay the enforcement of its order pending this appeal. The district court would not stay its order

as applied to the Gartners, but did grant the stay as to other birth certificates the Department may issue pending the appeal of the district court's ruling. The district court's rationale in issuing this stay was that administrative problems would arise if the Department issued birth certificates to other married lesbian couples and we subsequently reversed the district court's decision. These administrative problems no longer exist because of our holding that section 144.13(2) presumptively listing only "the name of the husband" on the birth certificate is unconstitutional as applied to married lesbian couples who have a child born to them during marriage. Accordingly, on remand, we order the district court to lift the stay.

**IX.  Disposition.**

We affirm the judgment of the district court ordering the Department to issue a birth certificate naming Melissa Gartner as the parent of the child, Mackenzie Jean Gartner, because section 144.13(2) with its limited application allowing for only "the name of the husband" to appear on the birth certificate is unconstitutional as applied to a married lesbian couple who has a child born to them during their marriage. We also order on remand that the district court lift the stay as to other married lesbian couples.

Therefore, we remand the case to the district court to lift the stay. On remand, we instruct the district court to enter an order under 17A.19(10), remanding this case to the Department and ordering it to issue a birth certificate naming Melissa Gartner as the parent of the child, Mackenzie Jean Gartner.

**AFFIRMED AS MODIFIED.**

All justices concur except Mansfield and Waterman, JJ., who specially concur and Zager, J., who takes no part.

**MANSFIELD, Justice (concurring specially).**

The Iowa Department of Public Health accepts the decision in *Varnum v. Brien,* 763 N.W.2d 862 (Iowa 2009), for purposes of this appeal. I agree that if *Varnum* is the law, then Iowa Code section 144.13(2) cannot be constitutionally applied to deny Melissa Gartner's request to be listed as parent on the birth certificate of the child delivered by her same-sex spouse. Accordingly, I concur in the judgment in this case.

Waterman, J., joins this special concurrence.