# IN THE SUPREME COURT OF IOWA

No. 20–0804

Submitted March 23, 2021—Filed June 30, 2021

**PLANNED PARENTHOOD OF THE HEARTLAND, INC.,** on behalf of itself and its patients,

    Appellee,

vs.

**KIM REYNOLDS, IOWA DEPARTMENT OF HUMAN SERVICES, IOWA DEPARTMENT OF PUBLIC HEALTH,** and **KELLY GARCIA** in her Official Capacity as Director of the Iowa Department of Human Services and Interim Director of the Iowa Department of Public Health,

    Appellants.

---

Appeal from the Iowa District Court for Polk County, Paul Scott, Judge.

State and state agencies appeal district court order declaring Act placing conditions on participation in federally funded grant programs unconstitutional. **REVERSED AND REMANDED.**

Oxley, J., delivered the opinion of the court, in which Christensen, C.J., and Waterman, Mansfield, McDonald, and McDermott, JJ., joined. Appel, J., filed a dissenting opinion.

Thomas J. Miller, Attorney General, Jeffrey S. Thompson, Solicitor General, Thomas J. Ogden (argued), Assistant Attorney General, for appellants.

Julie A. Murray (argued) and Carrie Y. Flaxman of Planned Parenthood Federation of America, Washington, D.C., and Rita Bettis Austen of America Civil Liberties Union of Iowa Foundation, Des Moines, for appellee.

Alan R. Ostergren, Des Moines, and Charles D. Hurley, Urbandale, for amicus curiae the Family Leader Foundation.

**OXLEY, Justice.**

The Iowa General Assembly enacted sections 99 and 100 of House File 766, which added funding conditions prohibiting abortion providers from participating in two federally funded educational grant programs directed at reducing teenage pregnancy and promoting abstinence. A former grantee of both grants, now ineligible to receive funding, immediately sought declaratory and injunctive relief on the basis that the conditions violated its constitutional rights. The district court agreed and enjoined enforcement of the legislative enactments. Upon careful analysis of the challenged constitutional rights and the State's interest in selecting the messenger for its programs, we conclude the conditions are rationally related to the classification selected by the general assembly. Because an abortion provider lacks a freestanding constitutional right to provide abortions, any conditions premised on providing abortions cannot be considered unconstitutional. We reverse the district court's order striking down sections 99 and 100 of House File 766.

## I. Background Facts and Proceedings.

Planned Parenthood of the Heartland (PPH) challenges an amendment to Iowa law that prevents it from receiving federal grant funding under two state-administered programs in which it has historically participated: the Community Adolescent Pregnancy Prevention Program (CAPP), administered by the Iowa Department of Human Services, and the Personal Responsibility Education Program (PREP), administered by the Iowa Department of Public Health. The state agencies award federal grants to third parties through a competitive bidding process. Both programs focus on educating Iowa's youth about sexual education, including pregnancy prevention. PREP is particularly focused on providing programming to select counties in an effort to reduce teen

pregnancies and sexually transmitted infections (STIs) in high-risk areas of the state.

As a condition of the grants, recipients must use state-selected curricula in both programs. Neither curriculum allows discussion about abortion, and the funds for the programs are strictly prohibited from being used to support abortion-related services. The parties stipulate that PPH has neither used grant funding for abortion-related services nor discussed abortion as part of CAPP or PREP programming in the past.

PPH has been a grantee of CAPP and PREP funding since 2005 and 2012, respectively. In some cases, PPH has partnered with schools that do not otherwise have similar programming or trained personnel to provide CAPP and PREP programs. During the 2018–2019 contract period, PPH received awards of $182,797 for CAPP and $85,000 for PREP programming. PPH used that funding to provide CAPP or PREP services in ten different counties. In five of those counties (Des Moines, Lee, Linn, Pottawattamie, and Woodbury Counties), PPH was the only fiscal year 2020 CAPP or PREP applicant. If PPH does not receive funding for these grants, those five counties will likely not receive any CAPP or PREP programming.

On June 11, 2019, PPH signed four two-year CAPP contracts with the Iowa Department of Human Services and was approved for $463,374 in grant funding for CAPP programming during the first two-year period. On July 31, PPH signed a one-year PREP contract with the Iowa Department of Public Health containing three one-year renewal options and was awarded $85,076 in grant funding for the first year of PREP programming. PPH estimates the loss of CAPP and PREP funding will result in a 28% reduction in its education budget.

On April 27, 2019, the Iowa General Assembly passed sections 99 and 100 of House File 766 (the Act), which provide that any contract for CAPP or PREP funding entered into on or after July 1, 2019, must exclude from eligibility any applicant entity

> that performs abortions, promotes abortions, maintains or operates a facility where abortions are performed or promoted, contracts or subcontracts with an entity that performs or promotes abortions, becomes or continues to be an affiliate of any entity that performs or promotes abortions, or regularly makes referrals to an entity that provides or promotes abortions or maintains or operates a facility where abortions are performed.

2019 Iowa Acts ch. 85, §§ 99(1) (CAPP funding), 100(1) (PREP funding). Although the Act is written in general terms, an exception exempts from the exclusionary language any

> nonpublic entity that is a distinct location of a nonprofit health care delivery system, if the distinct location provides [CAPP or PREP] services but does not perform abortions or maintain or operate as a facility where abortions are performed.

*Id.* at §§ 99(1), 100(2). PPH asserts the exception is intended to benefit at least two existing CAPP and PREP grantees within the UnityPoint hospital system. On May 3, Governor Kim Reynolds signed the Act into law.

By its terms, the Act clearly precludes PPH from participating in the CAPP and PREP programs. In 2017, PPH performed approximately 95% of all abortions in Iowa. Aside from PPH, only one other provider in Iowa performs abortions that are generally available to the public. Upon patient request, all PPH health centers refer patients for abortion care. PPH also engages in advocacy that supports access to abortion services for patients who decide to have an abortion. PPH is an ancillary organization of Planned Parenthood North Central States, a Planned Parenthood affiliate.

Shortly after the Governor signed the bill, PPH brought a declaratory judgment action arguing the Act violated PPH's rights to equal protection, due process, free speech, and free association under the Iowa Constitution. On May 29, the District Court for Polk County issued a temporary injunction enjoining enforcement of the Act, finding that PPH was likely to prevail on its equal protection claim. Two days later, on May 31, the Iowa Department of Human Services and the Iowa Department of Public Health, respectively, sent notices of intent to award PPH a three-year contract for CAPP programming and a four-year contract for PREP programming.

After cross motions for summary judgment, the district court granted PPH's motion for summary judgment. The district court concluded that the Act's "nonprofit health care delivery system" exception made the Act so overinclusive and underinclusive that it failed a rational basis review. The State appealed, and we retained the appeal.

## II.  Standard of Review.

"We review constitutional claims de novo." *AFSCME Iowa Council 61 v. State*, 928 N.W.2d 21, 31 (Iowa 2019). In reviewing constitutional challenges to statutes, "we must remember that statutes are cloaked with a presumption of constitutionality. The challenger bears a heavy burden, because it must prove the unconstitutionality beyond a reasonable doubt." *Id.* (quoting *State v. Seering*, 701 N.W.2d 655, 661 (Iowa 2005), *superseded by statute on other grounds*, 2009 Iowa Acts ch. 119, § 3 (codified at Iowa Code § 692A.103 (Supp. 2009)), *as recognized in In re T.H.*, 913 N.W.2d 578, 587–88 (Iowa 2018)).

## III.  Analysis.

PPH raises two primary challenges to the Act. PPH alleges the Act violates its equal protection rights under the Iowa Constitution by

unconstitutionally distinguishing between those who provide and advocate for abortion and those who do not. It also challenges the Act under the unconstitutional conditions doctrine, arguing the Act conditions the receipt of government funds on PPH giving up its rights to free speech, free association, and a due process right to provide abortions.

**A. Equal Protection Challenge.** PPH claims that the Act violates its right to equal protection under article I, sections 1[1] and 6[2] of the Iowa Constitution. In support of that contention, PPH argues that the Act is underinclusive, overinclusive, and not rationally related to a state interest. Alternatively, PPH argues the Act burdens its fundamental rights such that we should subject the Act to strict scrutiny review. We conclude rational basis is the appropriate level of scrutiny, and the Act passes rational basis review.

While federal precedent is instructive when interpreting Iowa's similar equal protection provisions, we are not bound to follow federal analysis in construing Iowa's constitutional provisions. *See Varnum v. Brien*, 763 N.W.2d 862, 878 & n.6 (Iowa 2009). We zealously protect our constitution's equal protection mandate, but we must also respect the legislative process, which means we start with a presumption that legislative enactments are constitutional. *AFSCME Iowa Council 61*, 928 N.W.2d at 31–32.

> Iowa's tripartite system of government requires the legislature to make difficult policy choices, including distributing benefits and burdens amongst the citizens of Iowa. In this process,

---

[1]"All men and women are, by nature, free and equal, and have certain inalienable rights--among which are those of enjoying and defending life and liberty, acquiring, possessing and protecting property, and pursuing and obtaining safety and happiness." Iowa Const. art. I, § 1.

[2]"All laws of a general nature shall have a uniform operation; the general assembly shall not grant to any citizen, or class of citizens, privileges or immunities, which, upon the same terms shall not equally belong to all citizens." Iowa Const. art. I, § 6.

some classifications and barriers are inevitable. As a result, [we] pay deference to legislative decisions when called upon to determine whether the Iowa Constitution's mandate of equality has been violated by legislative action. More specifically, when evaluating challenges based on the equal protection clause, our deference to legislative policy-making is primarily manifested in the level of scrutiny we apply to review legislative action.

*Id.* (quoting *Varnum*, 763 N.W.2d at 879).

To begin the equal protection inquiry, "plaintiffs must allege that the defendants are treating similarly situated persons differently." *State v. Doe*, 927 N.W.2d 656, 662 (Iowa 2019) (quoting *King v. State*, 818 N.W.2d 1, 24 (Iowa 2012)). "If the two groups are not similarly situated, we need not scrutinize the legislature's differing treatment of them." *In re Det. of Hennings*, 744 N.W.2d 333, 339 (Iowa 2008). We must make the similarly situated determination "with respect to the purposes of the law." *Varnum*, 763 N.W.2d at 883 (emphasis omitted).

The State argues that PPH fails this threshold test because organizations that provide abortions are not similarly situated to those that do not provide abortions in the context of a law seeking to exclude proabortion messages from state-sponsored sexual education programs. The State's argument requires us to consider the purposes behind the funding conditions contained in the Act. "Once the purposes of the law are considered in determining whether persons in the differently treated classes are similarly situated, the distinction between the threshold test and the ultimate identification and examination of the purposes of the law becomes blurred." *State v. Dudley*, 766 N.W.2d 606, 616 (Iowa 2009). There is an "inescapable relationship between the threshold test and the ultimate scrutiny of the legislative basis for the classification." *Id.*; *see also AFSCME Iowa Council 61*, 928 N.W.2d at 32 ("[D]etermining whether classifications involve similarly situated individuals is intertwined with

whether the identified classification has any rational basis.").  For this reason, we generally reserve application of the threshold test to extreme disparities in classifications.  *See Houck v. Iowa Bd. of Pharmacy Exam'rs*, 752 N.W.2d 14, 21 (Iowa 2008) (finding pharmacists are not similarly situated to nonpharmacists for purposes of a statute regulating certain drugs); *State v. Kout*, 854 N.W.2d 706, 708 (Iowa Ct. App. 2014) (finding that a defendant out on bail is not similarly situated to defendants awaiting trial in jail for purposes of a rule awarding credit for time served pretrial).  Given this overlap, we will assume the two groups are similarly situated and "focus instead on the grounds justifying the law."  *Tyler v. Iowa Dep't of Revenue*, 904 N.W.2d 162, 168 (Iowa 2017).

We next determine what level of scrutiny applies.  "[T]he level of scrutiny depends on the type of state statutory classification under attack."  *Sherman v. Pella Corp.*, 576 N.W.2d 312, 317 (Iowa 1998).  "In most cases," we apply the "very deferential" rational basis test.  *Varnum*, 763 N.W.2d at 879.  Under rational basis review, a statute survives an equal protection challenge

> so long as there is a plausible policy reason for the classification, the legislative facts on which the classification is apparently based rationally may have been considered to be true by the governmental decisionmaker, and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational.

*Id.* (quoting *Racing Ass'n of Cent. Iowa v. Fitzgerald* (*RACI II*), 675 N.W.2d 1, 7 (Iowa 2004).  While this level of scrutiny is "admittedly deferential" to the legislative branch, "it is not a toothless one."  *RACI II*, 675 N.W.2d at 9 (second quoting *Mathews v. De Castro*, 429 U.S. 181, 185, 97 S. Ct. 431, 434 (1976)).  We must engage in a "meaningful review . . . mandated by our constitutional obligation to safeguard constitutional values."  *Id.*

PPH also argues that strict scrutiny applies because the Act targets its fundamental rights. Cases that involve "[a] classification based on race or national origin and classifications affecting fundamental rights" require strict scrutiny. *Sherman,* 576 N.W.2d at 317. Fundamental rights are commonly articulated as those "which are 'deeply rooted in this Nation's history and tradition' and 'implicit in the concept of ordered liberty.' " *Seering,* 701 N.W.2d at 664 (quoting *Chavez v. Martinez,* 538 U.S. 760, 775, 123 S. Ct. 1994, 2005 (2003)). Under strict scrutiny, a law is presumptively invalid, and the burden is on the government to show that the law is "narrowly tailored to serve a compelling state interest." *In re S.A.J.B.,* 679 N.W.2d 645, 649 (Iowa 2004) (quoting *Santi v. Santi,* 633 N.W.2d 312, 318 (Iowa 2001)).

Because the district court held that the Act fails even rational basis review, we start with the lower level of scrutiny. In conducting rational basis review, we first "determine whether there was a valid, 'realistically conceivable' purpose that served a legitimate government interest." *AFSCME Iowa Council 61,* 928 N.W.2d at 32 (quoting *Residential & Agric. Advisory Comm., LLC,* 888 N.W.2d 24, 50 (Iowa 2016)). "Next, [we] must evaluate whether the 'reason has a basis in fact.' " *Id.* (quoting *McQuistion v. City of Clinton,* 872 N.W.2d 817, 831 (Iowa 2015)). Here, "actual proof of an asserted justification [is] not necessary, but [we will] not simply accept it at face value and [will] examine it to determine whether it [is] credible as opposed to specious." *Qwest Corp. v. Iowa State Bd. of Tax Rev.,* 829 N.W.2d 550, 560 (Iowa 2013). "Finally, 'we evaluate whether the relationship between the classification and the purpose for the classification "is so weak that the classification must be viewed as arbitrary." ' " *AFSCME Iowa Council 61,* 928 N.W.2d at 33 (quoting *Residential & Agric. Advisory Comm., LLC,* 888 N.W.2d at 50).

The State presented three different purposes for the law: to express its preference for childbirth over abortion, to ensure that its state-sponsored sexual education message is not delivered by entities that derive significant revenue from abortion-related activities, and to avoid indirectly subsidizing abortion providers. Only one of these purposes must be rational for the Act to pass constitutional muster.

"[T]he Constitution does not forbid a State or city, pursuant to democratic processes, from expressing a preference for normal childbirth . . . ." *Poelker v. Doe*, 432 U.S. 519, 521, 97 S. Ct. 2391, 2392 (1977); *see also Webster v. Reprod. Health Servs.*, 492 U.S. 490, 509, 109 S. Ct. 3040, 3052 (1989) ("[Missouri's] decision here to use public facilities and staff to encourage childbirth over abortion 'places no governmental obstacle in the path of a woman who chooses to terminate her pregnancy.'" (quoting *Harris v. McRae*, 448 U.S. 297, 315 100 S. Ct. 2671, 2687 (1980)). Additionally, "[w]hen the government disburses public funds to private entities to convey a governmental message, it may take legitimate and appropriate steps to ensure that its message is neither garbled nor distorted by the grantee." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 833, 115 S. Ct. 2510, 2519 (1995). As a general matter, the state is entitled to refuse to fund abortion efforts. *See Maher v. Roe*, 432 U.S. 464, 473–74, 97 S. Ct. 2376, 2382–83 (1977). Thus, all three purposes advanced by the State are legitimate purposes under rational basis review.

We next consider whether the classification made by the Act has a basis in fact, giving deference to the general assembly. Under rational basis review, we "uphold legislative classifications based on judgments the legislature could have made, without requiring evidence or 'proof' in either a traditional or a nontraditional sense." *King*, 818 N.W.2d at 30.

It is clear from the record that PPH is a vocal advocate in support of a woman's right to obtain an abortion and in its provision of abortion-related services. Advocating for abortion is an important component of its platform. While the CAPP and PREP programs expressly preclude any discussion about abortion within the context of the programs, and the parties agree PPH has never overstepped the bounds of the programs, the programs are aimed largely at preventing teenage pregnancies through abstinence and contraception. The programs are presented to school-age children, often related to a school setting. Even if the programs do not include any discussions about abortion, the goals of promoting abstinence and reducing teenage pregnancy could arguably still be undermined when taught by the entity that performs nearly all abortions in Iowa. The State could also be concerned that using abortion providers to deliver sex education programs to teenage students would create relationships between the abortion provider and the students the State does not wish to foster in light of its policy preference for childbirth over abortion. The government has considerable leeway in selecting who will deliver a government message, whether the message is a diversity and inclusion program, a drug prevention program, or, in this case, a sexual education and teen pregnancy prevention program.

These considerations provide a factual basis to support the State's assertion that the general assembly could have passed the Act out of concern that its message could be diluted if PPH, the primary abortion provider in the state, delivered the state-sponsored sexual education programs. *See Planned Parenthood of Greater Ohio v. Hodges*, 917 F.3d 908, 910 (6th Cir. 2019) (en banc) (holding that a similar funding condition passed rational basis review based on state's concern that it would

"muddl[e]" its message of preferring live birth over abortion "by using abortion providers as the face of state healthcare programs").

Finally, "a merely rational relationship between the classification and the policy justification" satisfies rational basis review. *AFSCME Iowa Council 61*, 928 N.W.2d at 32 (quoting *Varnum*, 763 N.W.2d at 879). This final step includes evaluating the Act for overinclusiveness and underinclusiveness. *Varnum*, 763 N.W.2d at 899–900. "As the degree to which a statutory classification is shown to be over-inclusive or under-inclusive increases, so does the difficulty in demonstrating the classification substantially furthers the legislative goal." *Id.* at 900. If a statute is underinclusive, it does not address all possible aspects of the state interest, and if the statute is overinclusive, it affects things that have nothing to do with the state interest. *Id.* at 899–900. Yet, only when there exist "extreme degrees of overinclusion and underinclusion in relation to any particular goal" can a statute "be said to [not] reasonably further that goal." *Bierkamp v. Rogers*, 293 N.W.2d 577, 584 (Iowa 1980) (en banc) (concluding statute barring recovery by guest in automobile against driver was "so overinclusive and underinclusive" to defy rational basis review where "[t]he certainty with which just claims are and would be barred and the relative ease with which collusion can be accomplished despite the statute is obvious"); *see also AFSCME Iowa Council 61*, 928 N.W.2d at 40 (holding limitation on mandatory collective bargaining topics for units comprised of less than thirty percent public safety employees "is not so extremely overinclusive or underinclusive as to flunk our deferential rational basis review"); *Ames Rental Prop. Ass'n v. City of Ames*, 736 N.W.2d 255, 260–61 (Iowa 2007) (explaining, in assessing whether zoning ordinance restricting area to single-family dwellings was so extremely over-

and underinclusive to fail rational basis, "[c]ity council members are permitted to legislate based on their observations of real life").

The district court held, and PPH argues, that the Act cannot survive rational basis because the levels of overinclusion and underinclusion demonstrate that the classification does not further the State's goals. The underinclusion in the Act stems from the carve out for any grantee that operates at a "distinct location" but is affiliated with "a nonprofit health care delivery system." As PPH points out, this exception

> would permit entities to participate in CAPP and PREP even if they belong to a health care delivery system that routinely provides abortion-related services, is well-known in the community for that service, garners significant revenue from abortion, and promotes and refers patients for abortions in Iowa.

PPH argues that if the Act's purpose is to prohibit entities that provide abortion services from delivering the State's sexual education messages, then the law is underinclusive because the exception allows some entities that engage in those same activities to participate in the programs. PPH also contends that the Act is overinclusive because it bars "entities that do not provide abortion in Iowa at all, but instead provide referrals for abortion, engage in advocacy to protect and expand abortion access, or associate with abortion providers or advocates."

The carve out's distinction between abortion providers and "nonprofit health care delivery systems" provides a rational distinction between the two UnityPoint entities included in the carve out and PPH. The carve out is limited to a distinct location of a "nonprofit health care delivery system" where no abortions are performed at the distinct location. A "nonprofit health care delivery system" is expressly defined as a "regional health care network consisting of hospital facilities . . . that provide a range of primary, secondary, and tertiary inpatient, outpatient, and physician

services." 2019 Iowa Acts ch. 85, §§ 99(3), 100(4). So the carve out allows a distinct part of a broad-based healthcare entity, essentially a hospital, to provide the CAPP and PREP programming—as long as the distinct location does not perform abortions—even if the healthcare entity itself does so. PPH's services, on the other hand, are focused specifically on "reproductive health services," including "well-patient exams, cancer screening, STI testing and treatment, a range of birth control options including long-acting reversible contraceptives, and transgender healthcare," as well as medication and surgical abortions. The State supports the carve out by arguing that a clinic associated with a hospital, which happens to provide abortions at other locations, presents a different type of messenger than an entity that focuses solely on reproductive health. Given the deference owed to the general assembly under rational basis review, this argument adequately explains the carve out. The general assembly could make a rational decision that its abstinence and pregnancy prevention messages will be less likely to be diluted when presented by an entity providing a broad range of healthcare services than one limited to reproductive health, with a focus on abortion.

In any event, any underinclusion caused by the carve out is not extreme, which is required before the legislation would fail rational basis review. PPH performs 95% of the abortions in the State of Iowa. If the Act's purpose is to prohibit abortion providers from delivering Iowa's sexual education message to youth, then a statute barring the organization responsible for 95% of abortions from providing the educational programs is not extremely underinclusive. *See AFSCME Iowa Council 61*, 928 N.W.2d at 39 ("[D]efining the class of persons subject to a regulatory requirement . . . requires that some persons who have an almost equally strong claim to favored treatment be placed on different sides of

the line . . . [and this] is a matter for legislative, rather than judicial, consideration." (omissions and second alteration in original) (quoting *Wis. Educ. Ass'n Council v. Walker*, 705 F.3d 640, 655 (7th Cir. 2013))).

PPH also argues the Act is overinclusive and could be more targeted to the State's goals. PPH notes that if it is ineligible to participate in the CAPP and PREP programs, a number of youth will be deprived of the benefits of the educational programs, pointing to the five counties in which PPH is the only applicant to seek funding and provide the programming. This is not an example of overinclusiveness but an expression of PPH's disagreement with the legislation. "Overinclusiveness" would mean that the legislation denies participation to entities that do not provide abortions. PPH gives no example of where that has occurred. But in any event, "under the rational basis test, we do not require the [statute] to be narrowly tailored." *Ames Rental Prop. Ass'n*, 736 N.W.2d at 260. Nor does the ineffectiveness of the conditions make the Act "violative of the Iowa Constitution under the rational basis test, [unless] the classification [is shown to] involve '*extreme* degrees of overinclusion and underinclusion in relation to any particular goal.' " *Id.* (quoting *RACI II*, 675 N.W.2d at 10).

The fit of a statute does not have to be perfect to satisfy a rational basis review. *See LSCP, LLLP v. Kay–Decker*, 861 N.W.2d 846, 859 (Iowa 2015) ("[T]he fit between the means chosen by the legislature and its objective need only be rational, not perfect.").[3] The CAPP and PREP programs involve sexual education for teenagers aimed at preventing teenage pregnancy. Abortion is a potential response to an unintended pregnancy, providing a logical connection to the pregnancies the CAPP and

---

[3]PPH's reliance on the First Amendment case of *Ward v. Rock Against Racism*, 491 U.S. 781, 109 S. Ct. 2746 (1989), has no bearing on our equal protection rational basis review. The narrowly tailored standard for a direct First Amendment challenge is inapposite to a rational basis analysis.

PREP programs are designed to prevent. The educational programs are not so unrelated to abortion as to make irrational the State's judgment that its educational message may be distorted if delivered by an abortion provider. *See Hodges*, 917 F.3d at 911–14 (Ohio funding restrictions for government-sponsored health and educational programs targeting sexually transmitted diseases, breast and cervical cancer, teen pregnancy, infant mortality, and sexual violence were sufficiently related to abortion to support restrictions on program recipients who perform or promote nontherapeutic abortions); *cf. U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 533–35, 93 S. Ct. 2821, 2825–26 (1973) (requirement for household members to be related not rationally related to limit on receipt of food stamps under justification of limiting subsidy to "one economic unit" sharing cooking facilities, where congressional history revealed intent to exclude hippies from program). Having concluded the Act's distinction between abortion providers and nonabortion providers is rationally related to the State's purpose of choosing the speaker for its educational messages, we need not address the State's other purposes supporting the Act.

While we disagree with the district court's conclusion that the Act fails rational basis review, we may affirm its holding that the Act violates PPH's equal protection rights on any basis supported by the record. *See Gartner v. Iowa Dep't of Pub. Health*, 830 N.W.2d 335, 350 (Iowa 2013). Thus, we consider whether the Act is subject to strict scrutiny. PPH contends that strict scrutiny applies because the Act affects its fundamental right to provide abortions, a woman's fundamental right to obtain an abortion, and its rights to freedom of speech and freedom of association.

The core problem with PPH's position is that it rests on an internal contradiction. On the one hand, PPH argues that its abortion services "are wholly separate from and do not use or rely on CAPP or PREP funding." On the other hand, PPH argues that the challenged legislation denying it CAPP and PREP funding "burdens the fundamental right to abortion."

PPH argues that a restriction on abortion providers obtaining grant money for sexual education programming affects a woman's ability to obtain an abortion. The facts, and PPH's own arguments, do not support such a conclusion. PPH concedes that no matter the outcome of this litigation, its abortion services will not be affected. Logically so, since PPH is prohibited from using any of the grant funds for abortion-related services. If PPH receives the funds, they will be used only to provide the educational programming. If PPH does not receive the funds, it will not provide the programming. Whether PPH receives the funds and provides the programming or does not receive the funds and does not provide the programming, a woman's ability to obtain an abortion from PPH is unaffected. PPH's argument itself admits the Act will have no effect on a woman's fundamental right to obtain an abortion.

In arguing that the Act fails rational basis review, PPH maintained that the CAPP and PREP programs have "nothing to do with abortion." Its contradictory line of reasoning selectively weaves its way through the facts to assert that the CAPP and PREP programs simultaneously have nothing to do with abortion yet still burden a woman's ability to obtain an abortion. PPH cannot have it both ways.

Since the right to obtain an abortion is unaffected, it follows that the Act does not affect any right PPH may have to provide abortions, regardless of whether that right is fundamental for purposes of triggering strict scrutiny under an equal protection challenge. PPH has failed to identify a

fundamental right burdened by the Act's exclusion of abortion providers from its grant funding, and the Act is therefore not subject to strict scrutiny. The Act does not violate PPH's equal protection rights.

**B. Unconstitutional Conditions.** PPH also seeks to uphold the district court's ruling that the Act is unconstitutional by arguing the Act violates the unconstitutional conditions doctrine premised on PPH's rights to free speech, association, and due process. We have never before recognized the unconstitutional conditions doctrine as a limit on state funding decisions. As a general matter, the unconstitutional conditions doctrine provides that the government may not require a recipient of government funds to forego certain constitutional rights as a condition to receiving the funds. *See, e.g.*, *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.* (*Agency I*), 570 U.S. 205, 213–14, 133 S. Ct. 2321, 2327–28 (2013). The doctrine has long existed in United States Supreme Court jurisprudence, though the exact contours of the doctrine are not always clear.

We first dispense with procedural issues raised by the parties. The State argues we should not consider this argument on appeal because it was not fully argued below due to the district court's resolution of the case on equal protection grounds. "Although the district court did not decide the case on constitutional grounds, we can consider these grounds on appeal to affirm the trial court's judgment, because the [plaintiff] made the constitutional challenges below." *Gartner*, 830 N.W.2d at 350. We proceed to consider PPH's unconstitutional conditions challenge.

We start with the premise that the government is not required to remain viewpoint neutral. By its very nature, the general assembly legislates based on policy decisions favoring one view over another all the time: "competition over cartels, solar energy over coal, weapon

development over disarmament, and so forth." *Agency I*, 570 U.S. at 221, 133 S. Ct. at 2332 (Scalia, J., dissenting). In the context of abortion, the legislature may make the policy decision to favor childbirth over abortion, which means it can also choose to fund childbirth but withhold funding for abortion. *See Maher*, 432 U.S. at 473–74, 97 S. Ct. at 2382 (explaining that a woman's constitutional right to be free "from unduly burdensome interference with her freedom to decide whether to terminate her pregnancy . . . implies no limitation on the authority of a State to make a value judgment favoring childbirth over abortion, and to implement that judgment by the allocation of public funds"). "[V]iewpoint-based funding decisions can [also] be sustained in instances in which the government is itself the speaker, or in instances, like *Rust* [*v. Sullivan*, 500 U.S. 173, 111 S. Ct. 1759 (1991)], in which the government 'used private speakers to transmit specific information pertaining to its own program.'" *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 541, 121 S. Ct. 1043, 1048 (2001) (citation omitted) (quoting *Rosenberger*, 515 U.S. at 833, 115 S. Ct. at 2519).

Given this premise, it is noncontroversial that the legislature has "the authority to impose limits on the use of [grant] funds to ensure they are used in the manner [the legislature] intends." *Agency I*, 570 U.S. at 213, 133 S. Ct. at 2328. Notwithstanding, the unconstitutional conditions doctrine prevents the government from making funding decisions that "deny a benefit to a person on a basis that infringes his constitutionally protected . . . [rights] even if he has no entitlement to that benefit." *Id.* at 214, 221 133 S. Ct. at 2328, 2332 (omission in original) (quoting *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 59, 126 S. Ct. 1297, 1307 (2006)) (holding requirement for organizations receiving funding under United States Leadership Against HIV/AIDS, Tuberculosis, and

Malaria Act to affirmatively express opposition to prostitution violated First Amendment free speech protections by compelling, as a condition of federal funding, the affirmation of a belief that by its nature could not be confined within the scope of the government program).  In other words, "even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely."  *Perry v. Sindermann*, 408 U.S. 593, 597, 92 S. Ct. 2694, 2697 (1972).  This is so because

> if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited.  This would allow the government to "produce a result which [it] could not command directly."  Such interference with constitutional rights is impermissible.

*Id.* (alteration in original) (citation omitted) (quoting *Speiser v. Randall*, 357 U.S. 513, 526, 78 S. Ct. 1332, 1342 (1958)).

The Supreme Court has characterized the unconstitutional conditions doctrine as "vindicat[ing] the Constitution's enumerated rights by preventing the government from coercing people into giving them up." *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604, 133 S. Ct. 2586, 2594 (2013).  While the doctrine has particular application in protecting First Amendment rights, *see Perry*, 408 U.S. at 597, 92 S. Ct. at 2697 ("[The government] may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech."); *see also Rust*, 500 U.S. at 197–99, 111 S. Ct. at 1774–75 (holding the Department of Health and Human Services could condition participation in family planning projects under Title X of the Public Health Service Act on agreement not to counsel, refer, or provide information about abortions as a method of family planning without

violating recipients' free speech rights as long as condition applied only within the program), it has also been applied to the Fifth Amendment right to just compensation, *see Koontz*, 570 U.S. at 599, 604, 133 S. Ct. at 2591, 2594 (holding water district imposed improper restrictions on application for land-use permits), the fundamental right to travel, *see Mem'l Hosp. v. Maricopa Cnty.*, 415 U.S. 250, 269 94 S. Ct. 1076, 1088 (1974) (holding county's requirement that indigent be resident of county for one year before extending healthcare benefits burdened the right to travel), and the right to due process under the Fourteenth Amendment, *see R.S.W.W., Inc. v. City of Keego Harbor*, 397 F.3d 427, 434–35 (6th Cir. 2005) (considering whether owners of microbrewery had constitutionally protected property interest under Fourteenth Amendment to liquor license in challenging administrative condition placed on licensee), among others.

"[T]he government may not require a person to give up a constitutional right . . . in exchange for a discretionary benefit conferred by the government where the benefit sought has little or no relationship to" the constitutional right given up. *Dolan v. City of Tigard*, 512 U.S. 374, 385, 114 S. Ct. 2309, 2317 (1994). Government action that pressures someone into forfeiting their constitutional rights by withholding benefits violates the unconstitutional conditions doctrine regardless of whether the government is ultimately successful in its coercive efforts. *See Koontz*, 570 U.S. at 606, 133 S. Ct. at 2595. The relevant distinction "is between conditions that define the limits of the government spending program," which are allowed, "and conditions that seek to leverage funding to regulate speech [or other protected conduct] outside the contours of the program itself," which are not. *Agency I*, 570 U.S. at 214–15, 133 S. Ct. at 2328.

But if a condition does not implicate the recipient's constitutional rights, it cannot be considered unconstitutional. *See Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.* (*Agency II*), 591 U.S. \_\_\_, \_\_\_, 140 S. Ct. 2082, 2087–88 (2020) (rejecting challenge by plaintiffs' foreign organizations, who had no constitutional rights when acting in foreign countries, to same funding condition found unconstitutional in *Agency I* when applied to plaintiffs' American organizations, explaining "plaintiffs cannot export their own First Amendment rights to shield foreign organizations from Congress's funding conditions").[4]   At bottom, the doctrine comes into play when the government uses funding or other benefits in an effort to coerce the recipient into giving up their own constitutional rights.  "This doctrine, sometimes murky, requires close attention to the potentially implicated right." *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't Health*, 699 F.3d 962, 969 (7th Cir. 2012).

With this understanding of the doctrine, we examine the constitutional rights PPH claims are burdened by the Act's conditions. *See Hodges*, 917 F.3d at 915 ("The unconstitutional-conditions doctrine no more *elevates* non-constitutional claims into constitutional ones than it *insulates* protected rights from protection.").   The Act precludes disbursement of CAPP and PREP funds to any applicant that engages in specific activity, including: providing abortions, promoting abortions, or affiliating with those who perform or promote abortions.  *See* 2019 Iowa Acts ch. 85, §§ 99(1), 100(1).  PPH asserts these conditions violate its rights to due process, free speech, and free association, respectively.   PPH admittedly engages in all three of these activities.  Therefore, if any of these

---

[4]We note that the Supreme Court has never found a condition unconstitutional where the plaintiff challenged conditions that impacted anything other than their own constitutional rights.  *See Hodges*, 917 F.3d at 926 n.8 (White, J., dissenting).  We therefore tread carefully in this nuanced area of the law.

conditions passes constitutional muster, PPH is properly excluded from the funding and its unconstitutional conditions claim must fail. *See Hodges*, 917 F.3d at 911.

We begin with the limitation that denies funding to grantees who provide abortions. PPH argues this funding condition violates its due process rights. PPH must first establish it has a constitutional due process right to provide abortions before this condition can be considered unconstitutional. *See Planned Parenthood of Ind., Inc.*, 699 F.3d at 986 ("The first step in any unconstitutional-conditions claim is to identify the nature and scope of the constitutional right arguably imperiled by the denial of a public benefit."). This is consistent with the approach taken in *Rust*, where the Court identified the bases of the recipients' unconstitutional condition challenge as violating their First Amendment "right[s] to engage in abortion advocacy and counseling." 500 U.S. at 196, 111 S. Ct. at 1774. PPH argues abortion providers have a freestanding right to provide abortions and that right is coextensive with the right of women to receive abortions. The few courts that have considered this claimed right have generally rejected it.

In *Planned Parenthood of Greater Ohio v. Hodges*, an Ohio Planned Parenthood affiliate made the same argument in its challenge to an Ohio statute similar to Iowa's Act. 917 F.3d at 911–12. The United States Court of Appeals for the Sixth Circuit relied on *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 884, 112 S. Ct. 2791, 2824 (1992) (plurality opinion), to conclude abortion providers do not have a freestanding right to perform abortions. *Id.* at 912. Specifically, the court relied on *Casey*'s statement that

> [w]hatever constitutional status the doctor-patient relation may have as a general matter, . . . in the present context it is derivative of the woman's position. The doctor-patient relation

> does not underlie or override the two more general rights under which the abortion right is justified: the right to make family decisions and the right to physical autonomy. On its own, the doctor-patient relation here is entitled to the same solicitude it receives in other contexts.

*Id.* (quoting *Casey*, 505 U.S. at 884, 112 S. Ct. at 2824). In *Planned Parenthood of the Heartland v. Reynolds*, we stated a woman's fundamental due process rights to obtain an abortion under the Iowa Constitution are similarly premised on rights of autonomy that are personal to her, including her right to shape her "own identity, destiny, and place in the world" without unwarranted intrusion from the state. 915 N.W.2d 206, 237 (Iowa 2018).

PPH offers no authority to support a provider's freestanding due process right to provide an abortion. We agree with the Sixth Circuit that "[i]n the absence of a constitutional right to perform abortions, the plaintiffs have no basis to bring an unconstitutional-conditions claim." *Hodges*, 917 F.3d at 912; *see also Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 690 (9th Cir. 2017) ("Never has it been suggested, for example, that if there were no burden on a woman's right to obtain an abortion, medical providers could nonetheless assert an independent right to provide the service for pay."); *Planned Parenthood of Ind., Inc.*, 699 F.3d at 986 ("Planned Parenthood's unconstitutional-conditions claim necessarily derives from a woman's constitutional right to obtain an abortion." (citing *Casey*, 505 U.S. at 846, 112 S. Ct. at 2804)). Given the "deeply personal nature" of the rights we have recognized related to obtaining an abortion, *Planned Parenthood of the Heartland*, 915 N.W.2d at 234, any possible right a provider may have by way of performing the procedure is no more than derivative of a woman's personal rights.

The dissent attempts to import third-party standing into the unconstitutional conditions analysis by arguing the State is attempting to

do indirectly what it cannot do directly: banning abortion providers from performing abortions. But "[t]he direct-indirect dynamic . . . is not by itself what triggers the doctrine." *Hodges*, 917 F.3d at 914. The direct-indirect formulation makes sense when a condition is used to leverage the recipient's own constitutional rights. If the government cannot mandate a recipient to give up its constitutional rights, it should not be able to reach the same result by conditioning a government benefit on the relinquishment of those same constitutional rights. *See Perry*, 408 U.S. at 597, 92 S. Ct. at 2697 ("[I]f the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited.").

But using the direct-indirect framework does not work when the recipient relies on the derivative rights of others to challenge a funding condition. The Supreme Court has cautioned that "[l]ike any general rule," allowing an abortion provider to claim standing to vindicate the constitutional rights of a third party "should not be applied where its underlying justifications are absent." *Singleton v. Wulff*, 428 U.S. 106, 114, 96 S. Ct. 2868, 2874 (1976). Inserting the derivative right into the direct-indirect formula would improperly superimpose the derivative rights analysis onto the unconstitutional conditions doctrine, essentially using a tail-wagging-the-dog logic to turn the derivative right into a direct right. "Medical centers do not have a constitutional right to offer abortions. Yet, if we granted [PPH] relief today, we would be effectively saying that they do. That is not the role of the unconstitutional-conditions doctrine." *Hodges*, 917 F.3d at 915.

Our holding under the unconstitutional conditions doctrine does not implicate PPH's ability to bring a derivative constitutional challenge

asserting a woman's rights, a claim PPH did not make. That claim would need to be analyzed under the proper constitutional framework. The dissent attempts to usurp the unconstitutional conditions doctrine and use that analysis instead. To assert a derivative claim, the plaintiff must first show that a state's regulation of the plaintiff's activities adversely affects the rights of another. *See, e.g.*, *Whole Woman's Health v. Hellerstedt*, 579 U.S. ___, ___, 136 S. Ct. 2292, 2312 (2016) ("[T]he admitting-privileges requirement places a 'substantial obstacle in the path of a woman's choice.' " (quoting *Casey*, 505 U.S. at 877, 112 S. Ct. at 2820)); *Singleton*, 428 U.S. at 117, 96 S. Ct. at 2875 ("[A]n impecunious woman cannot easily secure an abortion without the physician's being paid by the State. The woman's exercise of her right to an abortion . . . is therefore necessarily at stake here."). As a threshold matter, third-party standing requires the right—here, a woman's right to an abortion—to be "inextricably bound up with the activity the litigant wishes to pursue." *Singleton*, 428 U.S. at 114, 96 S. Ct. at 2874. The activity PPH wishes to pursue is participation in the CAPP and PREP programs. Thus, the question in the derivative right context would be the effect of the challenged State action—here, precluding PPH from participating in the CAPP or PREP programs—on a woman's right to obtain an abortion.[5] And as we explained in our equal protection analysis, precluding abortion

---

[5]PPH's concession that it will give up participation in the CAPP and PREP programs rather than stop performing abortions would likely defeat the derivative claim had it been made. *See Whole Woman's Health*, 579 U.S. at ___, 136 S. Ct. at 2316 (affirming district court's conclusion that requirements for abortion facilities to meet surgical-center standards placed "a substantial obstacle in the path of women seeking an abortion" based on evidence it would reduce the number of available abortion facilities in Texas below the number needed to meet the demand). As already noted, the awards that PPH has received for CAPP and PREP services do not, and cannot, contribute to PPH's overhead for abortion-related services. So discontinuing the CAPP and PREP funding has no adverse impact on PPH's ability to keep providing abortions.

providers from receiving funding for the educational CAPP and PREP programs has no effect on a woman's ability to obtain an abortion. In the words of *Singleton*, a woman's constitutional rights related to abortion are not "inextricably bound up" with the CAPP and PREP funding. *Id.* A woman's derivative rights are simply not implicated here.

Where abortion providers have no constitutional right to perform abortions, we conclude the unconstitutional conditions doctrine does not prohibit the State from barring abortion providers from receiving CAPP and PREP funding. In light of this conclusion, we need not consider PPH's free speech and free association challenges. PPH concedes it performs abortions, and it is precluded by the Act from receiving funds under that condition. Therefore, we need not decide whether the other conditions involving advocating for abortion or affiliating with abortion providers would also prevent it from receiving the grant funds. *See Hodges*, 917 F.3d at 911 ("Because the conduct component of the Ohio law does not impose an unconstitutional condition in violation of due process, we need not reach the free speech claim."). Any discussion of PPH's first amendment or free association challenges would therefore be advisory, an opinion we have "neither . . . a duty nor the authority to render." *Hartford–Carlisle Sav. Bank v. Shivers*, 566 N.W.2d 877, 884 (Iowa 1997).

## IV. Conclusion.

For these reasons, the decision of the district court is reversed, and the case is remanded for further proceedings.

**REVERSED AND REMANDED.**

Christensen, C.J., and Waterman, Mansfield, McDonald, and McDermott, JJ., join this opinion. Appel, J., files a dissenting opinion.

#20–0804, *Planned Parenthood v. Reynolds*

**APPEL, Justice (dissenting).**

In this case, the district court resolved the controversy by determining that the exception in the statutes, 2019 Iowa Acts ch. 85, §§ 99, 100, for certain health care facilities rendered the statutes so overbroad and under inclusive that the statutes violated equal protection under the Iowa Constitution.

I, however, take a different approach. I conclude that the statutes impose unconstitutional conditions on Planned Parenthood of the Heartland (PPH) by attempting to restrict abortion activities done on "their own time and dime." The legislature through unconstitutional conditions in these statutes is trying to accomplish indirectly what it cannot do directly: namely, attack abortion rights. This cannot be permitted. For the reasons expressed below, I would affirm the lower court's grant of PPH's motion for summary judgment on other grounds.

**I. Background.**

**A. Overview of Legislative Regulation of Abortion.**

1. *Federal restrictions.* In 1973, the United States Supreme Court decided *Roe v. Wade.* 410 U.S. 113, 93 S. Ct. 705 (1973). Since the *Roe* decision, opponents of the decision have sought ways to limit its scope through federal and state legislative and executive action.

On the federal level, the first successful effort to limit the impact of *Roe* was the Helms Amendment to the Foreign Assistance Act. Foreign Assistance Act of 1973, Pub. L. No. 93-189, § 2, 87 Stat. 714, 716 (codified as amended at 22 U.S.C. § 2151b(f)(1)). Passed in 1973, the Helms Amendment declared that "[n]one of the [Foreign Assistance Act] funds . . . may be used to pay for the performance of abortions as a method of family planning or to motivate or coerce any person to practice abortions." *Id.*

The Helms Amendment, however, did not prevent private funds from being used for abortion purposes, on an entity's own time and dime, but only limited the use of foreign aid dollars for that specific purpose. It regulated solely how government money was spent.

In 1976, Congress passed the Hyde Amendment. Departments of Labor and Health, Education, and Welfare Appropriation Act of 1977, Pub. L. No. 94-439, § 209, 90 Stat. 1418, 1434 (1976). The Hyde Amendment provides, in relevant part, "[n]one of the funds contained in this Act [Medicaid] shall be used to perform abortions except where the life of the mother would be endangered if the fetus were carried to term." *Id.* In *Harris v. McRae*, the United States Supreme Court, over a dissent by Justice Brennan, upheld the Hyde Amendment from constitutional attack. 448 U.S. 297, 326–27, 100 S. Ct. 2671, 2693 (1980). In *Maher v. Roe*, the Supreme Court held that the right to choose an abortion did not impose an affirmative burden on the government to remove obstacles to the exercise of the right if the government did not create the obstacle. 432 U.S. 464, 474, 97 S. Ct. 2376, 2382–83 (1977). Neither of these cases purported to control abortion related activities that private entities did on their own time and dime.

In 1984, President Reagan's Administration announced what has been called "the Mexico City Policy," an abortion restriction named after the location of a conference where the administration announced its new policy. *See* Samantha Lalisan, *Policing the Wombs of the World's Women: The Mexico City Policy*, 95 Ind. L.J. 977, 985 (2020) [hereinafter Lalisan]. Under the Mexico City Policy, the United States would no longer contribute foreign aid "to separate nongovernmental organizations which perform or actively promote abortion as a method of family planning in other nations." *Id.* (quoting The White House Office of Policy and Development, *US Policy*

*Statement for the International Conference on Population*, 10 Population & Dev. Rev. 574, 578 (1984)).

The Mexico City Policy was unsuccessfully challenged on free speech, association, and privacy grounds in *DKT Mem'l Fund Ltd. v. Agency for Int'l Dev.*, 887 F.2d 275, 282–99 (D.C. Cir. 1989), and *Planned Parenthood Fed'n of Am., Inc. v. Agency for Int'l Dev.*, 915 F.2d 59, 60–61 (2d Cir. 1990). In the ensuing years, the Mexico City Policy was on again and off again depending upon the viewpoint of the administration in power. *See* Lalisan, 95 Ind. L.J. at 988–89. Under the Trump administration, the Mexico City Policy was expanded to include all global health assistance funds. *Id.* at 990–92.

Finally, the executive branch engaged in additional regulation of abortion when the Department of Health and Human Services promulgated rules prohibiting the use of Title X funds for programs in which abortion counseling, referrals, or promotions were included. *See Rust v. Sullivan*, 500 U.S. 173, 177–81, 111 S. Ct. 1759, 1764–66 (1991). The Supreme Court in *Rust v. Sullivan* upheld the regulations on the ground that the federal government had the power to control the manner in which *its own funds* were spent. *Id.* at 201–02, 111 S. Ct. at 1776–77. The rules in *Rust* were thus not time-and-dime-type regulations. Even so, the approach of the Supreme Court in *Rust* has been criticized as being insufficiently protective of free speech. *See, e.g.*, Roberta J. Sharp, *Holding Abortion Speech Hostage: Conditions on Federal Funding of Private Population Planning Activities*, 59 Geo. Wash. L. Rev. 1218, 1230–32 (1991); Christina E. Wells, *Abortion Counseling as Vice Activity: The Free Speech Implications of* Rust v. Sullivan *and* Planned Parenthood v. Casey, 95 Colum. L. Rev. 1724, 1725–26 (1995).

2. *State regulation.* State legislatures have also been active in the area of regulation of abortion. Physicians and abortion providers challenged direct state restriction on abortion in a series of cases including *Doe v. Bolton*, 410 U.S. 179, 193–201, 93 S. Ct. 739, 748–52 (1973) (finding statute requiring abortions be conducted at hospitals or accredited hospitals, requiring the interposition of a hospital abortion committee, requiring confirmation by other physicians, and limiting abortion to Georgia residents unconstitutional), *Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52, 67–79, 96 S. Ct. 2831, 2840–45 (1976) (striking down spousal and blanket parental consent requirements and limitations on certain procedures), *City of Akron v. Akron Center for Reproductive Health, Inc.*, 462 U.S. 416, 439–52, 103 S. Ct. 2481, 2497–2504 (1983) (striking down parts of provisions of a statute related to parental consent, informed consent, twenty-four-hour waiting period, and disposal of fetal remains for second trimester abortions), *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 881–901, 112 S. Ct. 2791, 2822–33 (1992) (invalidating spousal consent provision but upholding informed consent requirements, twenty-four-hour waiting period, parental consent provisions, reporting and recordkeeping requirement of statute), *Whole Woman's Health v. Hellerstedt*, 579 U.S. ___, ___, 136 S. Ct. 2292, 2310–18 (2016) (invalidating requirements that abortion providers have admitting privileges at local hospitals and that abortion facilities meet standards for ambulatory surgical centers), and *June Medical Services L.L.C. v. Russo*, 591 U.S. ___, ___, 140 S. Ct. 2103, 2112–13 (2020) (plurality opinion) (same).

Most recently, a number of states have sought to "defund" abortion provider and advocate Planned Parenthood. For example, the State of Indiana passed a statute barring Planned Parenthood from receiving any

Medicaid reimbursement, a provision that was upheld in *Planned Parenthood of Indiana, Inc. v. Commissioner of Indiana State Department of Health.* 699 F.3d 962, 985 (7th Cir. 2012). On the other hand, in *Planned Parenthood of Central North Carolina v. Cansler*, the district court entered a preliminary injunction preventing enforcement of a defunding statute. 804 F. Supp. 2d 482, 483–84 (M.D.N.C. 2011). Cases discussing the defunding controversy are discussed in greater detail below. These indirect regulations seek to prohibit funding based upon what Planned Parenthood does on its own time and dime.

## II. Third-Party Standing to Assert Abortion Rights.

Of all the major abortion rights cases, *Roe* is the only one to have been brought directly by a pregnant woman. Since *Roe*, in case after case, abortion providers or doctors have brought cases asserting claims based upon the abortion rights of women. *See, e.g.*, *Casey*, 505 U.S. at 845, 112 S. Ct. at 2803.

The fountainhead case in the abortion context is *Singleton v. Wulff.* 428 U.S. 106, 96 S. Ct. 2868 (1976). *In Singleton*, the Supreme Court found that physicians had standing to challenge a Missouri statute that excluded from Medicaid coverage abortions that were not "medically indicated." *Id.* at 108, 96 S. Ct. at 2871. The plurality emphasized that "the most effective advocates" should be permitted to defend third-party rights where there is a close relationship between the litigant and where there is hindrance to the third-party's ability to litigate. *Id.* at 114–16, 96 S. Ct. at 2874–75. After *Singleton*, the Supreme Court has considered abortion cases brought by providers or doctors in a long line of cases. *See, e.g., June Med. Servs.*, 591 U.S. at ___, 140 S. Ct. at 2118; *Whole Woman's Health*, 579 U.S. at ___, ___, 136 S. Ct. at 2301, 2314; *Gonzales v. Carhart*, 550 U.S. 124, 133, 127 S. Ct. 1610, 1619–20 (2007), *Ayotte v. Planned*

*Parenthood of N. New England,* 546 U.S. 320, 324–25, 126 S. Ct. 961, 965 (2006); *Stenberg v. Carhart,* 530 U.S. 914, 922, 120 S. Ct. 2597, 2605 (2000); *Mazurek v. Armstrong,* 520 U.S. 968, 969–70, 117 S. Ct. 1865, 1866 (1997) (per curiam); *Casey,* 505 U.S. at 845, 112 S. Ct. at 2803; *City of Akron,* 462 U.S. at 440 n.30, 103 S. Ct. at 2498 n.30; *Danforth,* 428 U.S. at 62, 96 S. Ct. at 2837–38; *Bolton,* 410 U.S. at 188–89, 93 S. Ct. at 745–46.

The Supreme Court has found third-party standing in other contexts after *Singleton.* For instance, in *Craig v. Boren,* the Supreme Court allowed a beer vendor to assert the rights of men aged 18 to 20 under a statute that prohibited men in that age group from consuming 3.2% beer while women of the same age were permitted to consume. 429 U.S. 190, 192–93, 97 S. Ct. 451, 454 (1976). Because men were impacted by the statute for only two years, any litigation they might bring would likely be moot before it could be authoritatively decided. *See id.* at 192–94, 97 S. Ct. at 454–55.

Most recently, the United States Supreme Court has considered two abortion cases that tested the approach of the new majority on the Supreme Court. The first case is *Whole Woman's Health,* 579 U.S. ___, 136 S. Ct. 2292, and the second case is *June Medical Services,* 591 U.S. ___, 140 S. Ct 2103.

In *Whole Woman's Health,* the Court considered a challenge by abortion providers, acting on behalf of themselves and their patients, to challenge Texas law related to abortion. 579 U.S. at ___, 136 S. Ct. at 2301. The Texas law required that physicians performing abortions to have admitting privileges at a hospital no further than thirty miles from the abortion facility on the day of procedure. *Id.* at ___, 136 S. Ct. at 2300.

Further, the Texas statute required that the facility meet the standards for an ambulatory surgical center.  *Id.*

The majority of the Court concluded that the provisions imposed an undue burden on the right to abortion under *Casey*.  *Id.* at ___, ___, 136 S. Ct. at 2312, 2318.  Notably, however, Justice Thomas dissented.  *Id.* at ___, 136 S. Ct. at 2321–30 (Thomas, J., dissenting).  Among other things, he asserted that the Court should not strike down abortion regulations "at the behest of abortion clinics and doctors."  *Id.* at ___, 136 S. Ct. at 2321. Justice Thomas acknowledged that since *Singleton*, the Court had "unquestioningly accepted doctors' and clinics' vicarious assertion of the constitutional rights of hypothetical patients."  *Id.* at ___, 136 S. Ct. at 2323.  But Justice Thomas asserted that the doctors and clinics should not have third-party standing in abortion cases.  *Id.*

In *June Medical Services*, the Supreme Court considered the constitutionality of a Louisiana law that was strikingly similar to the Texas law found unconstitutional in *Whole Woman's Health*.  591 U.S. at ___, 140 S. Ct. at 2112.  On the question of the standing of doctors and clinics to litigate the issue, Justice Breyer for the plurality found that the state had waived the issue.  *Id.* at ___, 140 S. Ct. at 2117.  Justice Breyer, however, noted that the rule regarding standing of third parties is "prudential" and cited a lengthy line of precedents where doctors and clinics litigated abortion issues.  *Id.* at ___, 140 S. Ct. at 2117–18.

Justice Thomas again dissented.  *Id.* at ___, 140 S. Ct. at 2142–53 (Thomas, J., dissenting).  He escalated the rhetoric by referring to doctors as "abortionists."  *Id.* at ___, 140 S. Ct. at 2142.  He concluded that the third-party standing question was not waived, that the rule against third-party standing was based on Article III rather than prudential concerns,

and that the doctors and clinics had no private rights of their own in the action. *Id.* at ___, 140 S. Ct. at 2143–49.

Justice Alito agreed with Justice Thomas on the standing issue. *Id.* at ___, 140 S. Ct. at 2153–54 (Alito, J., dissenting). Justice Alito suggested that the providers may have a financial interest in avoiding burdensome regulations that gives rise to a conflict of interests between the providers and abortion patients. *Id.* at ___, 140 S. Ct. 2166–68. Aside from the conflict of interest, Justice Alito concluded that abortion providers could not establish requisite close relationship to the third party and hindrance in the ability of the third party to bring the constitutional claims. *Id.* at ___, 140 S. Ct. at 2167–70.

*Whole Woman's Health* and *June Medical Services* are, of course, controversial on the merits of the "undue burden" test employed in the cases and its application. The continued validity of the long line of abortion cases where abortion providers were held to have standing to litigate has been questioned by what has so far been an increasing vocal minority of the Supreme Court as a tool to restrict abortion rights. Whether the previously-thought-settled notion that abortion providers have standing to litigate has also received attention in recent academic commentary. *See generally* Elika Nassirinia, Note, *Third-Party Standing and Abortion Providers: The Hidden Dangers of* June Medical Services, 16 Nw. J.L. & Soc. Pol'y 214 (2021) (discussing the different challenges to abortion providers' third-party standing in *June Medical Services*); Hannah Tuschman, *Challenging TRAP Laws: A Defense of Standing for Abortion Providers*, 34 Berkeley J. Gender L. & Just. 235 (2019) (discussing Targeted Regulation of Abortion Providers (TRAP) laws and the history of third-party standing in the abortion context); Brandon L. Winchel, Note, *The Double Standard for Third-Party Standing:* June Medical *and the*

*Continuation of Disparate Standing Doctrine*, 96 Notre Dame L. Rev. 421 (2020) (comparing the third-party standing doctrine in abortion cases and other cases).

The case before us is at the intersection of third-party standing and the unconstitutional conditions doctrine, which I turn to next.

**III.  Unconstitutional Conditions Doctrine.**

**A.  Introduction.**  The question of whether the statute violates the unconstitutional conditions doctrine is distinct from the equal protection challenge.  The unconstitutional conditions doctrine generally prevents the state from leveraging its allocation of benefits to "manipulate[ constitutional rights] out of existence."  *Frost v. R.R. Comm'n*, 271 U.S. 583, 594, 46 S. Ct. 605, 607 (1926).

In this case, the statutes impose three unconstitutional conditions: (1) that grant recipients not engage in abortion activity (the conduct prong), (2) that grant recipients not engage in abortion advocacy (the advocacy prong), and (3) that grant recipients shall not affiliate with other groups supporting abortion rights (the affiliation prong).  The majority asserts that because the conduct condition passes constitutional muster, we need not address the unconstitutionality of the advocacy and affiliation conditions.

The majority chooses to closely follow the approach presented in a challenge to a statute similar to the one before us in *Planned Parenthood of Greater Ohio v. Hodges,* 917 F.3d 908 (6th Cir. 2019) (en banc).  The majority also relies on *Planned Parenthood of Indiana.*  699 F.3d 962.

I rely on different authorities and come to a different conclusion.  In my view, the conduct, affiliate, and advocacy prongs all fail under the unconstitutional conditions doctrine.  My views generally align with the six-judge dissent in *Hodges.*  917 F.3d at 917–33 (White, J., dissenting).  I

reject the reasoning of *Planned Parenthood of Indiana*, 699 F.3d 962, and instead find support in *Planned Parenthood of Southwest & Central Florida v. Philip,* 194 F. Supp. 3d 1213 (N.D. Fla. 2016), and *Planned Parenthood of Central North Carolina v. Cansler*, 877 F. Supp. 2d 310 (M.D.N.C. 2012).

**B. The Distinction Between the Government's Control of Expenditures and Unconstitutional Conditions on Recipients.** At the beginning, it is important to distinguish between the power of government to control its own expenditures and the power of government to control the conduct of recipients of government funds that are conducted on their own time and dime. In this case, state government has chosen to provide a sex education program in which reference to abortion is prohibited. *See* 2019 Iowa Acts ch. 85, §§ 99, 100. As a general proposition, the Supreme Court cases hold that the state can determine the type of services it chooses to buy. Specifically, there is no government obligation to subsidize abortion or abortion counseling by including coverage for abortion or abortion counseling in public benefit programs. *See Hodges*, 917 F.3d at 912 (majority opinion). PPH accepts all the restrictions fashioned by the state in its sex education programs at issue in this case. And, it is undisputed that PPH has followed all such state-imposed restrictions in the many years that it has participated in the state's sex education programs.

The question under the unconstitutional conditions doctrine is quite different. Here, we do not deal with conditions imposed on a government program controlling what the government chooses to buy, but instead we face government restrictions on the conduct of the recipient outside the program itself. *Id.* at 928–29 (White, J., dissenting). While the state under Supreme Court precedents may control the content of its sex education program, the question raised by the unconstitutional conditions doctrine is whether the state may prohibit grantees from engaging in conduct the

state disfavors outside the government-sponsored program on its own time and dime. *Rust*, 500 U.S. at 197, 111 S. Ct. at 1774; *see also Regan v. Tax'n with Representation of Wash.*, 461 U.S. 540, 546, 103 S. Ct. 1997, 2001 (1983). In other words, the question is to what extent may the government, as a condition of receiving a government grant, reach out to regulate constitutional activity of a recipient outside the confines of the program. *See Hodges*, 917 F.3d at 917 (disagreeing with the power of the state to impose conditions on abortion provider for activity conducted on its own time and dime).

**C. Overview of Unconstitutional Conditions Doctrine.** The unconstitutional conditions doctrine has been around for a long time. The early cases describe the doctrine in general terms. It has been said that the government cannot leverage its allocation of benefit to "manipulate[ constitutional rights] out of existence" and cannot impose conditions which require the relinquishment of constitutional rights. *Frost*, 271 U.S. at 594, 46 S. Ct. at 607. Another case broadly declared "that the right to continue the exercise of a privilege granted by the state cannot be made to depend upon the grantee's submission to a condition prescribed by the state which is hostile to the provisions of the federal Constitution." *United States v. Chi., M., St. P., & P.R. Co.*, 282 U.S. 311, 328–29, 51 S. Ct. 159, 164 (1931). And, it has been declared that the state "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests." *Perry v. Sindermann*, 408 U.S. 593, 597, 92 S. Ct. 2694, 2697 (1972).

While these cases generally outline the unconstitutional conditions doctrine, more recent cases have added at least some details. For example, in *Koontz v. St. Johns River Water Management District*, the Supreme Court emphasized that a violation of the unconstitutional conditions doctrine

produces "constitutionally cognizable injury" even when a party refuses to cede to the coercive pressure. 570 U.S. 595, 607, 133 S. Ct. 2586, 2596 (2013). This is an important concept. Under *Koontz,* a party subjected to an unconstitutional condition does not bear the burden of a fact specific showing of the adverse impact on the exercise of the constitutional right involved.

A recent case gives us further insight into the application of the unconstitutional conditions limitation by the Supreme Court. In *Agency for International Development v. Alliance for Open Society International, Inc.*, the Supreme Court considered a statute that required organizations receiving federal funds to fight AIDS to have a policy explicitly opposing advocating for the legalization of prostitution and sex trafficking. 570 U.S. 205, 208, 133 S. Ct. 2321, 2324 (2013). The *Agency for International Development* Court noted that if the government directly required recipients to have such a policy, a violation of the First Amendment would be present. *Id.* at 213, 133 S. Ct. at 2327. According to the *Agency for International Development* Court, the question was whether the conditions on the grant "define the federal program" or whether they "reach outside it." *Id.* at 217, 133 S. Ct. at 2330. The Supreme Court concluded that the requirement that grant recipients explicitly oppose advocating for legalization of prostitution and sex trafficking was an unconstitutional condition. *Id.* at 221, 133 S. Ct. at 2332. A principle in *Agency for International Development* is that the government cannot attempt to achieve indirectly what it cannot achieve directly.

**D. Application of Unconstitutional Conditions Doctrine in Context of Abortion Rights.**

1. *Overview.* There have been a couple dozen cases dealing with the application of the unconstitutional conditions doctrine in the context

of abortion. The results are scattered. Some, like *Planned Parenthood of Indiana*, seem to support the state. 699 F.3d at 986–88. Others, like *Philip*, 194 F. Supp. 3d 1213, and *Cansler*, 877 F. Supp. 2d 310, seem to support the positions of PPH.

Many of the cases like *Planned Parenthood of Indiana* predate the very important unconstitutional conditions cases of *Koontz*, 570 U.S. at 607, 133 S. Ct. at 2596 (holding that there is no need to show acquiescence to unconstitutional demand), and *Agency for International Development*, 570 U.S. at 213, 221, 133 S. Ct. at 2327, 2332 (prohibiting indirect regulation when direct regulation would be unconstitutional), and are therefore of limited value. But the more recent *Hodges* case incorporates recent Supreme Court cases and has spirited majority and dissenting opinions. Both opinions are written with clarity and confidence. They come to opposite results. *Hodges* is thus an excellent vehicle to examine the application of the unconstitutional conditions doctrine in the context of abortion restrictions from two very different perspectives.

2. *Authorities prior to* Planned Parenthood of Greater Ohio v. Hodges. There are a number of cases that address the question of unconstitutional conditions in the abortion context prior to *Hodges*. A brief survey shows considerable variability in the approaches and outcomes but illustrates the tapestry of the relevant caselaw.

Some of the cases deal with the question of whether a Planned Parenthood affiliate may obtain state funds to support its program, including abortion services. For example in *Planned Parenthood Ass'n–Chicago Area v. Kempiners*, the district court ruled that the Planned Parenthood affiliate could not compel the state to adopt a provision of neutrality with respect to providing funds for abortion services. 531 F. Supp. 320, 325 (N.D. Ill. 1981), *vacated and remanded on other*

*grounds*, 700 F.2d 1115 (7th Cir. 1983) (per curiam). As a result, according to the district court, the state "is free to express its preference for childbirth, by subsidizing it and not abortion." *Id.*

But then, in *Planned Parenthood of Central & Northern Arizona v. State of Arizona*, the United States Court of Appeals for the Ninth Circuit considered the legality of a footnote in Arizona legislation that forbade state social welfare funds from being expended in support of "nongovernmental organizations that perform[ed] abortions and engage[d] in abortion-related activities." 718 F.2d 938, 941 (9th Cir. 1983). The district court granted summary judgment for Planned Parenthood of Central and Northern Arizona (PPCNA) and enjoined enforcement of the footnote. *Id.* On appeal, the Ninth Circuit held that the State of Arizona "may not unreasonably interfere with the right of Planned Parenthood to engage in abortion or abortion-related speech activities, but the State need not support, monetarily or otherwise, those activities." *Id.* at 944. The question was who interfered with whom: did PPCNA interfere with the state's right to spend its money as it pleases, or did the state interfere with PPCNA's right to engage in protected freedoms. *Id.* The Ninth Circuit remanded the case for further fact-finding on the question of whether a total withdrawal of state funds was the only way to prevent PPCNA from using state funds for abortion-related services. *Id.* at 946. On remand, however, the district court was instructed that it could not use the "freeing up" theory to withdraw state funds merely because an eligible entity was engaged in abortion activities disfavored by the state. *Id.* at 945.

Another district court case considering the unconstitutional conditions doctrine was *Planned Parenthood of Central Texas v. Sanchez*. 280 F. Supp. 2d 590 (W.D. Tex. 2003). Planned Parenthood of Central Texas challenged a statute that prevented disbursement of Medicaid

dollars to any entity that performed abortions even if the abortions were paid for by private funds. *Id.* at 593. The district court enjoined enforcement of the statute under the unconstitutional conditions doctrine. *Id.* at 609, 612. Although the district court believed the specific constitutional rights were far from clear, it concluded that:

> abortion providers have some constitutionally-protected right, derived from their patients' rights, to perform the services that are necessary to enable women to exercise their own constitutional rights. This derivative right stems from the fact that, as abortion providers who help women to realize their constitutional rights safely, the Plaintiffs are in a unique position to assert their patients' constitutional rights.

*Id.* at 608.

The United States District Court for the District of Kansas considered the unconstitutional conditions doctrine in *Planned Parenthood of Kansas, Inc. v. City of Wichita.* 729 F. Supp. 1282 (D. Kan. 1990). In this case, the district court held that a local government decision not to provide funding for family planning programs to Planned Parenthood of Kansas was unconstitutional "viewpoint-based discrimination" that singled out Planned Parenthood of Kansas on the basis of advocacy of unpopular ideas in violation of the First Amendment. *Id.* at 1287–88.

A few years later, in *Planned Parenthood of Mid-Missouri & Eastern Kansas, Inc. v. Dempsey*, the Eighth Circuit considered a state statute excluding abortion providers from receiving state family planning funds. 167 F.3d 458, 460 (8th Cir. 1999). In *Dempsey*, the court held that the restriction would be an unconstitutional condition unless the grantees were allowed to create independent affiliates that could perform abortions. *Id.* at 463–64.

In 2012, another federal district court considered an unconstitutional conditions claim in *Cansler*. 877 F. Supp. 2d 310. In *Cansler*, a state statute barred Planned Parenthood of Central North Carolina (PPCNC) from receiving state funds for contracts or grants with the state. *Id.* at 313. The district court noted that the defendant had produced no evidence that PPCNC would use or ever had used state funds to support abortion-related services. *Id.* at 320. Further, the state produced no evidence that the restriction was necessary to ensure that the state funds were not used for abortion services. *Id.*

As a result, the district court found that the statute imposed an unconstitutional condition on the plaintiff. *Id.* at 321. The district court specifically rejected the claim that the unconstitutional conditions doctrine did not extend to a provider of services to others. *Id.* In support of its conclusion, the district court cited *O'Hare Truck Service, Inc. v. City of Northlake*, 518 U.S. 712, 725–26, 116 S. Ct. 2353, 2360–61 (1996), and *Board of County Commissioners v. Umbehr*, 518 U.S. 668, 686, 116 S. Ct. 2342, 2352 (1996). Further, the district court noted that in *Rust*, 500 U.S. 173, 111 S. Ct. 1779, the service providers sought to continue to provide services to others. *Cansler*, 877 F. Supp. 2d at 321.

A few months later, however, the Fifth Circuit decided an unconstitutional conditions case that did not go the plaintiff's way in *Planned Parenthood Ass'n of Hidalgo County Texas, Inc. v. Suehs*. 692 F.3d 343 (5th Cir. 2012). In *Suehs*, the Fifth Circuit vacated a district court preliminary injunction related to provisions of Texas regulations prohibiting Medicaid providers from performing or promoting elective abortions. *Id.* at 346. The scope of the ruling is not entirely clear. The *Suehs* court, however, found that Texas could deny funds to organizations that perform elective programs, characterizing the regulation as "a direct

regulation of the definitional content of a state program." *Id.* at 350. With respect to restrictions on affiliates, the *Suehs* court indicated the regulation was problematic because it did not amount to a direct regulation of the content of a government program. *Id.* at 351. The preliminary injunction was vacated and the matter remanded for further proceedings. *Id.*

Shortly after *Suehs* was decided, the Seventh Circuit handed down *Planned Parenthood of Indiana.* 699 F.3d 962. In *Planned Parenthood of Indiana*, the Planned Parenthood affiliate challenged an Indiana statute that "prohibit[ed] state agencies from providing state or federal funds to 'any entity that performs abortions or maintains or operates a facility where abortions are performed.' " *Id.* at 967 (quoting Ind. Code § 5–22–17–5.5(b) (2011)). The Seventh Circuit noted that under applicable law, the state was not required to be neutral on the abortion issue. *Id.* at 987. The court noted that there was no viable claim that the denial of block grant funds would impose an undue burden on a woman's right to obtain an abortion. *Id.* at 988.

In 2016, the Tenth Circuit considered the unconstitutional conditions doctrine in *Planned Parenthood Ass'n of Utah v. Herbert*, 828 F.3d 1245 (10th Cir. 2016). In *Herbert*, the Governor of Utah directed state officials to stop providing Planned Parenthood Association of Utah (PPAU) with federal pass-through funds to carry out various state programs. *Id.* at 1247. The action was taken after the release of edited videos which suggested that PPAU was engaged in the illegal sale of fetal tissue. *Id.* at 1250. The state made no claim that PPAU misused funds or that it was unqualified to provide contracted services. *Id.* at 1251. It was also undisputed that PPAU had no direct connection to any of the activities allegedly depicted in the videos. *Id.* The *Herbert* court reversed the district

court denial of a preliminary injunction and remanded the case for its entry. *Id.* at 1266.

The *Herbert* court found that there was substantial likelihood that the state action violated the unconstitutional conditions doctrine. *Id.* at 1263. The *Herbert* court noted that the Governor's action was motivated by the lawful activity of PPAU associating with other providers. *Id.* at 1259.

The *Herbert* court also noted that the Planned Parenthood affiliate alleged, "without serious challenge from defendants," a Fourteenth Amendment right. *Id.* at 1260. The *Herbert* court quoted *City of Akron* for the proposition that " 'because abortion is a medical procedure, . . . the full vindication of the woman's fundamental right necessarily requires that her' medical provider be afforded the right to 'make his best medical judgment,' which includes 'implementing [the woman's decision] should she choose to have an abortion.' " *Id.* (alteration and omission in original) (quoting *City of Akron*, 462 U.S. at 427, 103 S. Ct. at 2491 (1983)).

Finally, in 2016, the Northern District of Florida considered the unconstitutional conditions issue in *Philip*, 194 F. Supp. 3d 1213. The case involved a statute enacted by the Florida legislature blocking abortion providers from receiving funds from state and local governments. *Id.* at 1215. In considering whether the legislation amounted to an unconstitutional condition, the court asked the question whether "the legislature could directly require the recipient to engage in (or abstain from) that unrelated activity." *Id.* at 1217. The court concluded that "the state could not directly prohibit the plaintiffs from providing abortions." *Id.*

The court further asserted that it was irrelevant whether any right belonging to Planned Parenthood of Southwest and Central Florida (PPSCF) related to abortions was derivative of the right of women. *Id.* at

1218. It noted that in *Rust,* the Supreme Court considered a restriction on the use of federal funds for abortions without making any distinction between the recipients' own rights and those derived from their patients. *Id.* The district court granted PPSCF a preliminary injunction. *Id.* at 1224.

3. Planned Parenthood of Greater Ohio v. Hodges. The recent *Hodges* case bears marked similarity to this case. A review of the majority and dissenting opinions provides a good overview of the issue presented in this case.

In 2016, Ohio enacted a statute that:

> require[d] the Ohio Department of Health to "ensure" that all of the funds it receives for the six programs "are not used to do any of the following: (1) Perform nontherapeutic abortions; (2) Promote nontherapeutic abortions; (3) Contract with any entity that performs or promotes nontherapeutic abortions; (4) Become or continue to be an affiliate of any entity that performs or promotes nontherapeutic abortions."

*Hodges*, 917 F.3d at 910 (majority opinion) (quoting Ohio Rev. Code § 3701.034(B)–(G) (2016)). The programs impacted by the statute targeted "sexually transmitted diseases, breast cancer and cervical cancer, teen pregnancy, infant mortality, and sexual violence." *Id.* The Ohio Department of Health determined that the statute required the end of contracts with the Planned Parenthood affiliates because the "entities perform abortions, advocate for abortion, and affiliate with other entities that do the same." *Id.* at 911. The district court enjoined the state from enforcing the law and a panel of the Sixth Circuit agreed. *Id.* The Sixth Circuit, however, decided to review the matter en banc. *Id.*

By a vote of 11–6, a majority of the Sixth Circuit reversed the district court. *Id.* at 917. Writing for the majority, Judge Sutton noted that "[p]rivate organizations do not have a constitutional right to obtain governmental funding." *Id.* at 911–12. While "the State may not condition

a benefit by requiring the recipients to sacrifice their constitutional rights," Judge Sutton reasoned that "[t]he Supreme Court has never identified a freestanding right to perform abortions." *Id.* at 912.

Citing language in *Casey*, 505 U.S. at 883, 112 S. Ct. at 2823 (plurality opinion), Judge Sutton stated that the physicians had no more constitutional rights in the abortion context than they did performing a kidney transplant. *Hodges*, 917 F.3d at 912. Judge Sutton asserted that the only other circuit court to address the issue—the Seventh Circuit in *Planned Parenthood of Ind.*, 699 F.3d at 962—came to the same conclusion. *Id.* at 913.

Judge Sutton maintained that the third-party standing doctrine did not fill the gap created by the lack of a provider's constitutional right related to abortion. *Id.* at 914. According to Judge Sutton, finding third-party standing in *Hodges* would "move the law perilously close to requiring States to subsidize abortions." *Id.*

Judge Sutton recognized that a claim might at some point be made that Ohio's statute posed such a burden on Planned Parenthood of Greater Ohio (PPGO) that it placed an undue burden on the right to an abortion. *Id.* at 916. But such a challenge, according to Judge Sutton, was premature as no hard evidence was developed in the record to support such a claim. *Id.*

Judge White dissented from the majority view in the case. *Id.* at 917 (White, J., dissenting). According to Judge White, under *Agency for International Development*, PPGO needed to show "(1) the challenged conditions would violate the Constitution if they were instead enacted as a direct regulation" (namely, regulations prohibiting PPGO from engaging in abortions), "and (2) the conditions affect protected conduct outside the scope of the government program." *Id.* A direct prohibition on PPGO from

performing abortions, according to Judge White, would clearly impose an undue burden on Ohio's women, thereby satisfying the first *Agency for International Development* prong. *Id.* at 921–23. Further, Judge White observed that the activities prohibited by the statute, performing abortions, advocating for abortion rights, or affiliating with organizations that engage in such actively, all are on Planned Parenthood's own "time and dime." *Id.* at 923 (quoting *Agency for Int'l Dev.*, 570 U.S. at 218, 133 S. Ct. at 2330). This "straightforward" application of the unconstitutional conditions doctrine, according to Judge White, should resolve the case. *Id.*

Judge White rejected the view that PPGO had to establish an independent constitutional right to abortion to invoke the unconstitutional conditions doctrine. *Id.* at 925–31. Among other things, Judge White emphasized that the right to an abortion has long been understood to be " 'inextricably bound up with' a provider's ability to offer [abortion] services." *Id.* at 918 (quoting *Singleton*, 428 U.S. at 114, 96 S. Ct. at 2874).

Judge White recognized that the majority's argument was that because PPGO had no constitutionally protected right as an abortion provider, it could not resort to the unconstitutional conditions doctrine. *Id.* at 925. Judge White responded by noting that the unconstitutional conduct caselaw merely required that the doctrine could be invoked to protect "constitutionally protected" conduct and that a woman's right to seek an abortion was certainly that. *Id.* Further, Judge White asserted that one of the core purposes of the unconstitutional conditions doctrine, namely, to prevent government from achieving indirectly what it could not achieve directly, was fully present in the case. *Id.* at 926. Ohio, according to Judge White, could not directly prohibit abortion providers from performing abortions without placing an undue burden on women seeking abortions in the area. *Id.* Indeed, as pointed out by Judge White, providers

established a challenge to burdensome law on due process grounds in *Whole Woman's Health*, 579 U.S. at ___, 136 S. Ct. at 2300. *Hodges*, 917 F.3d at 926.

Judge White directly challenged the Seventh Circuit's approach in *Planned Parenthood of Indiana*, 699 F.3d 962. *Hodges*, 917 F.3d at 927–29. She attacked the notion that a restriction was not actionable if it does not actually operate to impose an undue burden on women seeking abortions or upon the abortion providers. *Id.* at 928. According to Judge White, in *Agency for International Development*, the harm was caused by mere imposition of the condition. *Id.* at 928. And, Judge White cited *Koontz* for the proposition that "[a]s in other unconstitutional conditions cases in which someone refuses to cede a constitutional right in the face of coercive pressure, the impermissible denial of a governmental benefit is a constitutionally cognizable injury." *Id.* (quoting *Koontz*, 570 U.S. at 607, 133 S. Ct. at 2596).

Judge White noted that *Planned Parenthood of Indiana* failed to recognize the critically important difference "between conditions placed on the government *program* and those imposed on the *recipient*." *Id.* at 928. She noted that the entire discussion "rested on the undisputed propositions that the government can" fashion the nature of its program to favor childbirth. *Id.* at 929.

But for Judge White, the critical question is whether the state may indirectly impose a condition on recipients of state funds that it could not directly impose through regulation. *Id.* at 930. And, of course, Judge White emphasized that the state could not directly prohibit providers from providing abortions. *Id.* Yet, according to Judge White, the majority developed what amounted to a work around:

> [T]he majority creates a loophole that enables states to circumvent the unconstitutional-conditions doctrine: the government cannot leverage its funding to carve away at constitutional rights by passing laws that target the individual who holds the right, but it can leverage funding to achieve that same result so long as it manages to find a proxy to target instead.

*Id.* (emphasis omitted). Further, Judge White observed:

> [T]o permit the State to leverage its funding to launch a thinly veiled attack on women's rights so long as it camouflages its unconstitutional condition in provider-focused verbiage . . . strikes me as exactly the type of maneuver the doctrine seeks to prevent.

*Id.*

According to Judge White, the consequences of the majority's approach were breathtaking. *See id.* Indeed, the United States argued in the case that Ohio's "position would authorize the government to pass a law prohibiting all doctors who perform abortions from providing any other medical services." *Id.*

Judge White noted the potential power of undermining the ability of providers to provide abortions. *Id.* Just about all of the efforts to attack abortion rights before the Supreme Court have been state actions targeting abortion "providers, not women." *Id.*; *see also, e.g., Whole Woman's Health*, 579 U.S. ___, 136 S. Ct. 2292; *Stenberg*, 530 U.S. 914, 120 S. Ct. 2597; *Casey*, 505 U.S. 833, 112 S. Ct. 2791; *Hodgson v. Minnesota*, 497 U.S. 417, 110 S. Ct. 2926 (1990). According to Judge White, legislatures seeking to restrict "abortion rights have long understood: when a constitutional right requires a third party to vindicate it, a restriction imposed on that indispensable third party effectively restricts the rightholder." *Hodges*, 917 F.3d at 930. Judge White concluded:

> Because the unconstitutional-conditions doctrine does not allow the government to penalize a party indispensable to the exercise of a constitutional right so long as the party

refuses to cry uncle and submit to the condition, the conduct provision is unconstitutional.

*Id.* at 931.

Having found the conduct provision unconstitutional, Judge White proceeded to deal with the advocacy and affiliation provisions of the Ohio law. *Id.* Such claims, according to Judge White, were "patently meritorious." *Id.* Judge White quickly recognized that the state could regulate the content of the state program. *Id.* No problem there. Nor, according to Judge White, does the message become "garbled" as the underlying programs had nothing to do with abortion. *Id.* at 932. Judge White reasoned that the regulations "seek[] to impose restrictions on recipients' speech outside" the scope of the programs. *Id.*

The limitations on affiliation fared no better in the hands of Judge White. She found the restrictions plainly contrary to *Runyon v. McCrary*, 427 U.S. 160, 175, 96 S. Ct. 2586, 2597 (1976), and *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460, 78 S. Ct. 1163, 1171 (1958). *Hodges*, 917 F.3d at 932–33. These cases, according to Judge White, stand for the proposition that affiliation advances beliefs and ideas and is conduct protected by the First Amendment. *Id.*

**IV. Application of Unconstitutional Conditions Doctrine in This Case.**

In my view, the statute in this case violates the unconstitutional conditions doctrine. I find this conclusion is compelled for several reasons.

First, in my view, abortion providers like PPH may assert the rights of women seeking abortions as they have for over forty years. Third-party standing makes sense in the abortion context because of the short time frame involved and the difficulties of individual parties asserting their claims. Further, the ability to obtain an abortion is inextricably

intertwined with the ability to find an abortion provider. Regulation of providers thus has a direct impact on the ability of potential plaintiffs to exercise their right. Further, because of their resources and expertise, abortion providers are ordinarily in a better position to develop the constitutional claims than are individual plaintiffs. The rights of persons seeking abortion are inextricably intertwined with abortion providers as abortions cannot be safely performed without them. The intertwined relationship between those who seek abortions and abortion providers cannot be pulled apart by declarations that the providers have no constitutional rights themselves. The providers have standing to assert the constitutional rights of others because the rights of third parties are constitutionally welded to providers who are essential if the constitutional right is to be effectuated.

Second, assuming PPH has third-party standing, may the state simply ban PPH from providing abortions? As noted by the caselaw, a central question in the unconstitutional conditions doctrine is whether the state is attempting to achieve indirectly what it cannot do directly. In my view, the state could not issue a ban on PPH from providing abortion services. If the law were otherwise, the state could simply ban all providers from engaging in abortion activity and thereby, from a practical point of view, eviscerate a woman's right to choose an abortion.

In this case, there is not the remotest suggestion that there is a conflict of interest between PPH and its clients. In any event, I note that the conflict-of-interest theory between abortion providers and their clients has been rejected in a number of abortion cases. *See, e.g., McCormack v. Herzog,* 788 F.3d 1017, 1028 (9th Cir. 2015); *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott,* 748 F.3d 583, 589 n.9 (5th Cir. 2014); *Charles v. Carey,* 627 F.2d 772, 779 n.10 (7th Cir. 1980). It is

hard to imagine how there could be a conflict of interest under the facts presented in this case.

The ability to effectively litigate claims is as important as the underlying substantive law. A broadly framed constitutional right is of little value, for example, if most aggrieved parties are not in a position to prosecute claims. As a result, I regard this case as involving a very important question regarding the ability of abortion clients and their providers to challenge state law restrictions on the right of abortion. Although the majority declares its ruling on third-party standing is limited to indirect regulation, I fear that the majority opinion's suggestion that PPH is not asserting any rights of constitutional dimension lays the groundwork for placing barriers and obstacles designed to make challenges to stricter and stricter abortion regulation more and more difficult.

In sum, I agree with the approach of Judge White in *Hodges*. The State is attempting to impose a restriction on a provider of abortion indirectly which it may not directly impose. Further, provisions of the statutes that attempt to prohibit affiliation with other groups performing abortion rights or advocating abortion rights offend freedom of association rights under article I, section 7 of the Iowa Constitution. *See City of Maquoketa v. Russell*, 484 N.W.2d 179, 184 (Iowa 1992) (en banc). I would affirm the district court on the ground that the attempted regulation amounts to unconstitutional restriction on the right to abortion.

For the above reasons, I respectfully dissent.